**COMMONWEALTH of Pennsylvania,**
**Appellee**

**v.**

**Lennard Paul FRANSEN, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 12, 2011.

Filed March 2, 2012.

Robin A. Spishock, Public Defender, Stroudsburg, for appellant.

Jeremy Bolles, Assistant District Attorney, Stroudsburg, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., FORD ELLIOTT, P.J.E., MUSMANNO, BENDER, GANTMAN, PANELLA, ALLEN, LAZARUS, and MUNDY, JJ.

OPINION BY MUNDY, J.:

Appellant, Lennard Paul Fransen, appeals *nunc pro tunc* from the July 21, 2004 judgment of sentence of life imprisonment imposed after a jury found him guilty of first-degree murder, criminal homicide as an accomplice, and conspiracy to commit criminal homicide.[1] After careful review, we affirm.

The trial court summarized the relevant facts of this case as follows.

On the night of November 27, 2002, [the victim] was found dead in his house in East Stroudsburg, Pennsylvania by a neighbor. The victim had been shot in the upper torso and head seven times and was slumped against a chair. A subsequent statement by the victim's live-in girlfriend, Teri Lynn Levanduski (hereinafter "co-defendant Levanduski"), implicated [Appellant] as the shooter.

. . .

Co-defendant Levanduski resided with the victim in a house located at 98 Oak Terrace, East Stroudsburg, PA 18301. Her parents, Gus and Beverly Levanduski, live in a neighboring house. On November 27, 2002, shortly after 10:00 p.m., Gus Levanduski heard gunshots coming from the direction of co-defendant Levanduski's house. He exited his house and while he was standing in the driveway, a dirty colored car with two occupants drove by him.

Shortly thereafter, Beverly Levanduski, codefendant Levanduski's mother[,] called the house that co-defendant Levanduski and the victim shared. Mrs. Levanduski reported that she let the phone ring approximately twelve times with no answer. Mrs. Levanduski thereafter proceeded to the adjacent house and entered through the open back door. Mrs. Levanduski called out to the victim and received no response. She found the victim slumped over a living room chair with trauma to the head. At approximately 11:19 p.m., Mrs. Levanduski called the Monroe County Control Center, who advised her to take the victim's pulse. Mrs. Levanduski advised the Control Center that there was no pulse.

Police officers arrived at the scene and found the victim in the same posi-

---

1. 18 Pa.C.S.A. §§ 2501(a), 306, and 903, respectively.

tion as described by Mrs. Levanduski. Subsequent to the issuance of search warrants for the victim's house, the officers found what appeared to be a clump of hair on the porch of the house. There was also blood on a table located on the front porch. Trooper Philip Barletto testified at [Appellant's] preliminary hearing and noted that evidence of a struggle included a planter [that] had been knocked off the edge of a railing, a small entertainment cabinet had been knocked over, a candleholder had been knocked over, and there were several spots of blood on the deck. The police also found a torn up five page handwritten letter in the kitchen trash can written by the victim. The substance of the letter was that the victim's handgun was missing and that he was suspicious that Levanduski and [Appellant] may be conspiring to murder him. Hair found on the deck and on the rug at the scene was sent to the Bethlehem DNA Laboratory of the Pennsylvania State Police for testing. Linda Marie K. Comerosky, a serologist employed by the Pennsylvania State Police, examined the hair samples and testified at [Appellant's] preliminary hearing. Ms. Comerosky concluded that both samples were consistent with the beard hair sample submitted from [Appellant].

At approximately 11:30 p.m., on November 27, 2002, Beverly Levanduski called co-defendant Levanduski at work and advised her to return home immediately. Co-defendant Levanduski testified at her omnibus hearing that on her way home, she stopped off at the dumpsters near the Shawnee Racquetball Club to dispose of various letters she had received from [Appellant]. After arriving at her parents' house, co-defendant Levanudski remained there until approximately 1:30 p.m., on November 28, 2002, at which time she and her parents were requested by the police to report to Day Street location of the Stroud Area Regional Police Department at approximately 2:00 p.m.

Upon the Levanduski family's arrival at the Day Street location, co-defendant Levanduski was taken into an interview room. This occurred at approximately 1:50 p.m., on November 28, 2002. Detective Schmidt conducted the interview of codefendant, along with Detective Harry Miller. During the course of the interview, co-defendant Levanduski admitted to having an affair with [Appellant] and to driving [Appellant] to the end of her driveway shortly before the victim was murdered. [ ] Levanduski further stated that following [Appellant's] departure from the house, she drove him away from the scene and dropped him off on the side of a road. Subsequent to [ ] Levanduski being read the *Miranda* warning, she amended her statement to include that she had heard what she described as a scuffle inside the house, then a gunshot, then observed [Appellant] exit the house.

Trial Court Opinion, 9/12/03, 1–4 (footnote and internal citations omitted).

On April 11, 2003, Appellant was charged with the aforementioned crimes. On May 22, 2003, Appellant filed an omnibus pre-trial motion, and on July 7, 2003, a hearing on said motion was held.[2] By opinion and order entered September 12,

---

**2.** Appellant's motion requested, *inter alia,* that the trial court (1) sever his trial from that of co-defendant Levanduski, (2) suppress statements made by Levanduski, (3) suppress statements Appellant made to a cellmate, Eric Wurmser, (4) grant a motion *in limine* to preclude the Commonwealth from admitting a letter written by the victim, and (5) grant a motion *in limine* to preclude letters written to Appellant by Levanduski. *See* Omnibus Pretrial Motion, 5/22/03.

2003, the trial court denied Appellant's omnibus pretrial motion in part and granted it in part. Relevant to this appeal, the trial court stated the following.

> 6. [Appellant's] Motion *in limine* to suppress the letter from the victim is **GRANTED IN PART.** The letter may not be used as evidence of [Appellant's] guilt.

Trial Court Order, 9/12/03, at 16–17. Additionally, the trial court granted in part Appellant's motion to suppress letters from co-defendant Levanduski, qualifying that, if admitted, no letter should "be used as evidence of [Appellant's] guilt of criminal homicide. *Id.* The remainder of Appellant's claims were denied or dismissed as moot. *Id.*

On April 27, 2004, a five-day jury trial commenced. At the conclusion of trial, on May 3, 2004, a jury found Appellant guilty of criminal homicide, murder in the first-degree; criminal homicide as an accomplice; and conspiracy to commit criminal homicide. *See* Verdict Order, 5/3/04. On the same date, the trial court ordered a pre-sentence investigation (PSI). Thereafter, on July 21, 2004, Appellant was sentenced to life imprisonment. *See* Sentencing Order, 7/20/04.

On July 29, 2004, Appellant filed a timely notice of appeal. On August 16, 2004, the trial court ordered Appellant to file, within 14 days, a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).[3] On September 2, 2004, Appellant filed his Rule 1925(b) statement three days late. On September 13, 2004, the trial court filed a statement pursuant to Pa.R.A.P. 1925(a), indicating it would be relying on its "Opinion and Order dated September 12, 2003, and [the] on-record discussions during the course of trial." Trial Court Order, 9/13/04. Thereafter, on October 16, 2006, this Court, sitting *en banc,* affirmed Appellant's judgment of sentence concluding Appellant had waived all claims by failing to **timely** file a Rule 1925(b) statement. *Commonwealth v. Fransen,* 913 A.2d 940 (Pa.Super.2006) (unpublished memorandum), *appeal denied,* 591 Pa. 732, 921 A.2d 495 (2007). On April 25, 2007, our Supreme Court denied Appellant's petition for allowance of appeal. *Id.*

On April 3, 2008, Appellant filed a timely *pro se* PCRA petition raising various claims, including ineffective assistance of counsel.[4] On July 24, 2008, the PCRA court granted Appellant's petition in part, specifically finding that Appellant's counsel on direct appeal was ineffective for failing to file a timely Rule 1925(b) statement. PCRA Court Order, 7/24/08. As a result, the order stated Appellant had 30 days from the date of the order to file a *nunc pro tunc* notice of appeal. *Id.* at 3. The remainder of Appellant's PCRA claims were dismissed.

On August 12, 2008, prior to filing a notice of appeal, Appellant filed a *pro se* motion for a new trial based on after-discovered evidence. The trial court dismissed Appellant's motion on the basis that it had reinstated Appellant's direct appeal rights on July 24, 2008, and granted Appellant 30 days to file a notice of appeal. *See* Trial Court Order, 8/14/08.

On August 20, 2008, counsel filed a timely notice of appeal.[5] On August 22, 2008,

---

**3.** In 2004, Rule 1925(b)(2) required an appellant to file a concise statement within 14 days. Pursuant to the 2007 Amendments to Rule 1925, the time-period to file a concise statement has been extended to 21 days. *See* Pa.R.A.P. 1925.

**4.** In his *pro se* PCRA petition, Appellant checked the box indicating "I do not want a lawyer to represent me." *See* Motion for Post Conviction Collateral Relief, 4/3/08, at 7. Additionally, we note, Appellant filed an amended *pro se* PCRA petition on April 23, 2008.

**5.** The certified record does not indicate when

the trial court ordered Appellant to file a Rule 1925(b) statement within 21 days. On September 2, 2008, Appellant complied *pro se.* Thereafter, on September 4, 2008, the trial court filed an order stating Appellant's Rule 1925(b) statement had not been signed by Appellant's counsel, and therefore, "no response was required" at that time. Trial Court Order, 9/4/08. On September 12, 2008, Appellant's counsel filed a timely Rule 1925(b) statement.[6]

On September 15, 2008, Appellant filed a *pro se* motion "to withdraw unrequested counsel from any representation or dealings with this case[.]" In his *pro se* motion, Appellant references his April 3, 2008 *pro se* PCRA petition, stating that "it is clearly marked that [ ] Appellant does not want the assistance of [c]ounsel, therefore, [ ] Appellant respectfully asks that present unrequested Counsel (Wieslaw Niemoczynski), be removed[.]" *See* Motion to Withdraw Unrequested Counsel, 9/15/08, at 1. On this same date, the PCRA court filed its Rule 1925(a) opinion, again adopting its September 12, 2003 order and opinion.

On October 17, 2008, this Court remanded Appellant's case and ordered the trial court to conduct a hearing in accordance with *Commonwealth v. Grazier,* 552 Pa. 9, 713 A.2d 81 (1998), to determine whether Appellant's waiver of counsel was "knowing, intelligent and voluntary[.]" Subsequently, a hearing was held, and on November 21, 2008, the trial court determined Appellant's waiver of counsel complied with *Grazier, supra,* and therefore granted Appellant's request to proceed *pro se.* Trial Court Order, 11/21/08. It is at this juncture in this matter that the elaborate procedural history becomes convoluted.

On October 16, 2008, Appellant filed a *pro se* brief in support of his appeal. In his brief, however, instead of arguing his direct appeal, Appellant made several averments of ineffective assistance of counsel. It appears Appellant appealed from the order granting in part and denying in part his PCRA petition.[7] Following consideration of Appellant's brief, this Court affirmed the PCRA court's order granting Appellant's right to appeal *nunc pro tunc,* remanded the matter back to the trial court, and again ordered a *Grazier* hearing. *Commonwealth v. Fransen,* 986 A.2d 154 (Pa.Super.2009). A second *Grazier* hearing was held on February 12, 2010, at which time Appellant withdrew his request to proceed *pro se,* and counsel was again appointed.[8] Also, on said date, the PCRA court again granted Appellant 30 days to file his notice of appeal *nunc pro tunc. See* Trial Court Order, 2/12/10.

On March 12, 2010, Appellant filed a timely notice of appeal.[9] After review, on December 17, 2010, this Court filed an unpublished memorandum, vacating Appellant's judgment of sentence and remanding for a new trial, holding that the victim's letter was inadmissible hearsay and that the Commonwealth did not meet

counsel was appointed to represent Appellant. However, Appellant's August 20, 2008 notice of appeal was filed by Wieslaw Niemoczynski, Esquire, of the Monroe County Public Defender's Office.

**6.** We note Appellant's Rule 1925(b) statement was signed by Robin A. Spishock, Esquire, of the Monroe County Public Defender's Office.

**7.** As noted above, Appellant's direct appeal rights had been reinstated *nunc pro tunc* after

the PCRA court found counsel was ineffective for failing to file a timely 1925(b) statement. Appellant's appeal should properly have been from his June 20, 2004 judgment of sentence.

**8.** The PCRA court appointed Robin Spishock, Esquire, of the Monroe County Public Defender's Office.

**9.** Appellant and the trial court timely complied with Pa.R.A.P. 1925.

the burden of proving it was harmless error. The dissent agreed with the majority that the victim's letter was inadmissible hearsay but reasoned that the entry of the letter was harmless error.

On December 29, 2010, the Commonwealth filed a petition for reargument *en banc.* By order dated February 28, 2011, this Court granted the Commonwealth's petition for reargument and withdrew the panel decision.

In his substituted brief on reargument, Appellant raises the following issues for our review.

■ Whether the trial court erred and committed reversible error in allowing the testimony of Detective Miller at trial, regarding the statements made to police by co-defendant, Teri Levanduski, without redaction under *Bruton* ?

■ Whether the trial court erred and committed reversible error by denying Appellant's motion *in limine* to preclude the use of a letter written by the decedent where the letter was not dated and fit no hearsay exception to the rules of evidence?

■ Whether the trial court erred and committed reversible error in allowing the hearsay testimony at trial as to the ownership of a firearm and failing to cure the error with instruction to the jury[?]

■ Whether the trial court erred and committed reversible error in allowing Jackie Sandt to testify at trial over defense counsel's objection that the witness had been present in the courtroom? Appellant's Brief at 7.[10]

"[T]he admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Stutler,* 966 A.2d 594, 599 (Pa.Super.2009), *citing Commonwealth v. Treiber,* 582 Pa. 646, 874 A.2d 26, 31 (2005). "Admissibility depends on relevance and probative value." *Commonwealth v. Bullock,* 948 A.2d 818, 827 (Pa.Super.2008), *appeal denied,* 600 Pa. 773, 968 A.2d 1280 (2009) (citation omitted). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Id.* "Evidence, even if relevant, may be excluded if its probative value is outweighed by the potential prejudice." *Commonwealth v. Page,* 965 A.2d 1212, 1220 (Pa.Super.2009).

We begin by addressing Appellant's contention that the trial court committed reversible error by allowing Detective Harry Miller to testify with regard to statements made by co-defendant Levanduski to the police without redaction or a curative instruction pursuant to *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and *Commonwealth v. Fields,* 317 Pa.Super. 387, 464 A.2d 375 (1983).[11] Appellant's Brief at 16–17. In support of his averment that these state-

---

**10.** For purposes of our review, we have elected to renumber Appellant's issues.

**11.** Appellant has failed to point this Court to the particular testimony he believes was in violation of *Bruton.* Failing to direct this Court to specific portions of the record in support of an argument violates Pa.R.A.P. 2119(c), **Argument; Reference to record.** For that reason alone, we could conclude this issue is waived. *See Commonwealth v. Einhorn,* 911 A.2d 960, 970 (Pa.Super.2006) (concluding, *inter alia,* that a claim was waived for failure to direct this Court's attention to that part of the record substantiating his claim), *appeal denied,* 591 Pa. 723, 920 A.2d 831 (2007). Nevertheless, we have examined Detective Miller's testimony and to the extent that we can discern Appellant's argument, we have addressed it herein.

ments were inadmissible, Appellant argues Levanduski's statements to the police were the basis of the trial court's decision to grant Appellant's motion to sever the trials. *Id.* at 16. Appellant avers the statements made by Levanduski implicated herself, and to an extent, Appellant in the murder of the victim. *Id.* Further, Appellant argues that, other than a letter written by the victim, these statements were the only evidence of a conspiracy between himself and Levanduski.[12] *Id.* at 17.

■ At the outset, we note that contrary to Appellant's assertion, the trial court did not grant Appellant's motion to sever his trial from that of Levanduski. Rather, in its September 12, 2003 opinion, the trial court stated Appellant's motion to sever "has been rendered **moot** by the Commonwealth's decision to withdraw its joinder of the two trials." Trial Court Opinion, 9/12/03, at 4 (emphasis in original). Nevertheless, the crux of Appellant's argument is that the statements Levanduski made to Detective Miller, implicating a conspiracy between herself and Appellant, were inadmissible and should have been redacted or cured by an instruction to the jury.

In support of this argument, Appellant relies on *Bruton,* arguing that "[f]or purposes of alleviating confusion and preserving the integrity of the defendant's trial rights, the United States Supreme Court has fashioned a limiting jury instruction and the redaction of any information that implicates the co-defendant who did not make the statements." Appellant's Brief at 17. In *Bruton,* the United States Supreme Court addressed the issue of "whether the conviction of a defendant at a joint trial should be set aside although the jury was instructed that a codefendant's confession inculpating the defendant had to be disregarded in determining his guilt

or innocence." *Bruton, supra* at 144, 88 S.Ct. 1620. Therein, the jury was instructed that, "although [the appellant's co-defendant's] confession was competent evidence against [the co-defendant,] it was inadmissible hearsay against [the appellant] and therefore had to be disregarded in determining [the appellant's] guilt or innocence." *Id.* The *Bruton* Court held as follows.

> Despite the concededly clear instruction to the jury to disregard [the co-defendant's] inadmissible hearsay evidence inculpating [the appellant], in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for [the appellant's] constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

*Id.*

In the instant matter, the trial court was cognizant of the *Bruton* rule and took specific steps to ensure a situation invoking its applicability did not arise. At the start of Detective Miller's testimony, the Commonwealth asked Detective Miller, "[a]nd focusing on whatever Teri Levanduski may have said involving herself in this incident, what did she tell you?" N.T., 4/28/04, at 13. Defense counsel objected and the following sidebar conversation was held on the record.

> [The court]: The question[s] to him are related to her conduct, and she is not telling him[,] or he is not telling what she said about [Appellant]. I don't see that as a problem.
>
> [Defense counsel]: The problem is there's an unnecessary implication which is the whole reason for the *Bruton.*
>
> [The court]: She is charged with conspiracy and what she said to implicate herself has bearing and is relevant. So

---

12. We will address the admissibility of the letter written by the victim in issue two.

he is not allowed to say what Miss Levanduski may have said about [Appellant]. Okay.

*Id.* at 15.

In its Rule 1925(a) opinion, the trial court explained its reasoning for allowing limited testimony of Levanduski's statements as follows.

> [The trial court] allowed the questions with respect to [ ] Levanduski's involvement only. [The trial court] reasoned that inasmuch as [ ] Levanduski is charged with conspiracy, that whatever she said to Detective Miller to implicate herself does not have bearing [on Appellant] and is relevant to prove the conspiracy. Furthermore, [the trial court] limited Detective Miller's testimony so that he would not be allowed to say what [ ] Levanduski may have said about [Appellant]. Accordingly, the pre-trial record and trial transcript clearly establishes that there was no violation of *Bruton.*

Trial Court Rule 1925(a) Opinion, 5/24/10 at 3; Supplemental Certified Record. Upon careful review, we agree. The trial court ensured Detective Miller was limited to testifying only to Levanduski's involvement and to the extent she confessed her involvement in the victim's murder. The trial court thereby avoided the implications of the *Bruton* rule.

Further, Detective Miller's testimony regarding Levanduski's statements did not implicate or even reference Appellant. Detective Miller testified to the following statements made by Levanduski.

> [Q.] Okay. Now, Detective Miller, I'll repeat the question. During the conversations that you had with Teri Levanduski, didn't [sic] she make any statements involving her own involvement in the course of the action leading to the death of [the victim]?
>
> [A.] Yes, she did.

> [Q.] And if I can, did she indicate any awareness of a gun or revolver that [the victim] may have had?
>
> [A.] Yes.
>
> [Q.] What did she say in that regard?
>
> [Defense Counsel]: Objection
>
> [The Court]: Overruled.
>
> [Witness]: Could you repeat the question?
>
> [Q.] Yes. I asked if she mentioned any awareness of a gun or a revolver that [the victim] had, and you indicated yes. Specifically, with regard to her involvement in that issue, what did she say?
>
> [A.] Yes. Miss Levanduski stated specifically regarding a handgun she said that [the victim] and her were having trouble; it was a volatile relationship. She said that there was a revolver in the house. It was silver or chrome, and it was an older gun. Specifically it was a description she gave Detective Schmidt and myself in an interview of the gun. She indicated that because it was a volatile relationship and they were having problems, [the victim] could be mean. She took the gun out of the house two months prior to this incident.
>
> [Q.] There was earlier, Detective, a letter or note that was written by [the victim] that was introduced into evidence, and I'm trying to get the blowup of that. There was a reference in that as Commonwealth's No. 25, I believe. There's a reference to that of letters—
>
> [Defense Counsel]: Your Honor, objection.
>
> [The Court]: Come to sidebar.
>
> · · ·
>
> [The Court]: I'll allow the question.
>
> (Back on the record).
>
> [Q.] In the note, Detective, and I am referring to the last page of the blowup of that note, it said "I am going to put the letters I found with this letter so if

anything happens you have something to show the people." During your conversation with Miss Levanduski, did you ask her about the existence of other letters that [the victim] had?

[A.] Yes.

[Q.] And, sir, what did she say in that regard?

[A.] There were letters that she had reobtained after [the victim] found them, and she burned them. That is what she told us. And there were letters that they discarded that night, the night of the incident.

[Q.] And did she indicate concerning the letters that were discarded—not the letters that were burned but the ones that were discarded—where she had discarded them?

[A.] Yes. She stated that when she received the call from her mother at work on the night of the incident, on her way to the scene she stopped at what was Shawnee Racket Club near Pepe's Restaurant, which is located in East Stroudsburg and discarded them in a dumpster, the other group of letters.

[Q.] Thank you, sir.

N.T., 4/28/04, at 13–19. The scope of the Commonwealth's questions stayed within the context permitted by the trial court and did not call for Detective Miller to reference Appellant or his involvement. The statements Detective Miller testified to did not reference a conspiracy with Appellant but merely provided the jury with evidence of Levanduski's actions on November 27, 2002. The Commonwealth presented the evidence to prove that a conspiracy existed and that Levanduski was involved in the victim's murder. As a result, we agree with the trial court's conclusion that Detective Miller's statements did not invoke the applicability of the *Bruton* rule.

Moreover, Appellant's claim that Detective Miller's testimony regarding Levanduski's statements was the only evidence of a conspiracy is belied by the record. Several letters exchanged between Appellant and Levanduski were admitted into evidence at trial and read into the record. *See* N.T., 4/28/04, at 166–194. Detective Richard Wolbert testified that as part of the investigation, these letters were recovered from a dumpster at the Shawnee Racquetball Club, and from the New Jersey home where Appellant was apprehended. For purposes of our review, it is unnecessary to reiterate these letters in their entirety, but the following excerpts provide a glimpse of the evidence presented to the jury.

The following is from a letter recovered from the dumpster and signed by Levanduski which is addressed to "My poor lonely stalker."

I worry about you constantly, have you eaten? gotten any rest? have enough gas money? on and on. And I worry but [sic] you completing your mission safely and according to your plan. No mishaps, loopholes or problems of any kind. At this particular moment, the biggest worry I've ever had in my life. Praying for total and complete success and for your emotional well-being. You've undertaken a dangerous and extremely difficult task. That you would do it for me, for us, only makes me love you even more. Just when I think I couldn't possibly draw you any further into my heart you do or say something to prove that theory wrong. Thank you, for being the man of my dreams and desires. Always Teri.

N.T., 4/28/04, at 167–168. At the bottom of the letter she adds, "I love you [Appellant], with all of the love that one woman has to give. Loving you and missing you, wanting you always, Teri." *Id.* at 168.

Another letter, recovered from the New Jersey home where Appellant was resid-

ing, and penned by Levanduski, reads as follows.

> Even though, after all these years of bulls* *t, I need the personal satisfaction, his demise at my hands would only greatly compound the problem. The ideal solution is out there somewhere, just waiting for us to find it. And we will. You are what keeps me going [Appellant]. The hope of finally having a happy life, with a man that truly loves me is no longer an unobtainable dream. I try very hard to keep my mind focused on the future, our future. I'm extremely proud to be the woman that you've decided to bless with your heart.

*Id.* at 169.

At the conclusion of Detective Wolbert's testimony, he also read into evidence several letters written by Appellant. One such letter reads as follows.

> John says I should rethink our relationship because your [sic] married and only trouble can come from this. Well trouble is my middle name and no matter what comes down the road, I want you and I'm not changing my mind. He says I should put you on the spot and make you choose between me and him. I already know the answer. It's me. I'm in a hurry to get you away from him, I just don't know yet how to do it yet, without all hell breaking loose, but I'm still working on it. Believe me no one wants this time apart over sooner than me. I need you so bad I can taste it.

*Id.* at 182.

Contrary to Appellant's assertion, ample evidence was provided to the jury from which the jurors could have found beyond a reasonable doubt that a conspiracy exist-ed between Appellant and Levanduski. Therefore, we conclude that the rules set forth in *Bruton* were not violated in this matter. Detective Miller's testimony of Levanduski's statements did not implicate Appellant, and the statements admitted did not amount to a confession by her. Moreover, even without these statements there was ample evidence presented at trial from which the jury could have concluded Appellant and Levanduski entered into a conspiracy. Accordingly, we conclude Appellant's first issue fails.[13]

■ In his next issue, Appellant argues the trial court committed reversible error by denying Appellant's motion *in limine* to preclude the admission of a letter written by the victim. Appellant's Brief at 13. Specifically, Appellant avers the letter was the only source of evidence of "the relationship between Appellant and Ms. Levanduski, the missing .22 pistol, Ms. Levanduski's desire to end her relationship with [the victim], and the division of marital property." *Id.* at 14. Appellant contends the letter was hearsay "and therefore only admissible if it meets an exception to the hearsay rule as listed in Pa.R.E. 803." *Id.* at 15.

The letter written by the victim and entered into evidence, states the following.

> To whom it may concern:
>
> On around November 1st I found a note to Teri from a truck driver from Newark[,] NJ named Bob Beaton on the note he said he wanted to get together with her. So I ask[ed] her about it. She said that she gets notes all the time from the horney [sic] truck drivers. So I started to look around Teri's things and found two more notes. So I looked

---

**13.** To the extent that Appellant raises a hearsay argument in his brief, we conclude this issue has been waived for failure to preserve it in his Rule 1925(b) statement. *See Commonwealth v. Schofield*, 585 Pa. 389, 888 A.2d 771 (2005) (stating the bright-line rule under which failure to comply with Pa.R.A.P. 1925(b) results in automatic waiver of issue raised on appeal).

in her pocket book and I found a letter. The letter was to a guy named [Appellant] a truck driver[,] I think he lives in [Hackettsown], NJ. And works for Inter [County Paving] of [Hackettsown]. It described how Teri love[d] this man[,] how he made her fe[el,] and things they did. It [broke] my heart to read. So I looked even harder [and] I found [another] letter. It said that she wanted to leave me and that she could[n]'t stand me and said she wanted me gone so [she] and [Appellant] could be together and he should have everything I have. And that I was a lazy f* *k and didn't deserve to take another breath. She said I abused her and beat her. I have never hit her or any other woman in my life. I am writing this letter to tell someone in the second letter she said that some how they had to get rid of me so they could be together. I found the second letter the day [she] and her mother went to Lancaster to a Christmas play and stayed over [night]. That was November 21st and wasn't coming home [until] late Nov 22nd. She called about 9:50 PM the [night] of the 21st. I went to bed about 11:00 PM. I could not sleep thinking about her and this guy. So about 1:00 AM the dogs went crazy and were looking at the front door so I looked out the door and there was this big guy looking in the window so I turned on the light and ask him who he was[.] He said his name was [Appellant] and that he wanted to talk about Teri. I let him [in to] talk he told me he wanted Teri to live with him. We sat and talked till 3:45 AM about [what] had been going on that he had been f* *king her for about three months. I told him that I found the letter and I [knew] all about him and her and I would like to work it out with Teri and try to get [things] back to the way we used to be. He said that he wanted her for his own. So we decided [to] let her make the

decision. He left about 3:45 AM Friday morning. On Friday [night] Teri and her mom got home I said we have to talk. She said ok so we sat down and I read the letter to her. She said that she was mad at me for not [taking] her anywhere or [doing] anything with her and that was why she was f* *king this guy and wanted to live with him but couldn't pay me half of the value of the house [and] garage. That she thought that it would cost her 50 to 60 thousand dollars to pay me off. She said that she made good money now that she was working at the bridge. So on Saturday Nov 23rd she went to see him and [break] it off with him and stay with me. She [was] gone from noon to six [o'clock;] that [night] she said he pleaded with her to leave me. She said that she told him that she didn't want to lose [everything] and told him that she wanted to try to salvage [what] we had. So when she got home she told me that it was over and she was going to try to work things [out] with me. I said that I would try to forgive her and try to work things out with her. That [night] I started to think about it. She had to go to work. So I [lay] in bed and was thinking about all of this. I couldn't sleep so I [thought] about how this guy knew [where] we lived. I [asked] Teri if she told him [where] we lived. She said she didn't. So I was thinking about how he just stood and was looking in the door at 1:00 A.M. and [thought] about how anybody could just walk in from the road and be on my front porch in the middle of the [night]. This [guy's] name is [Appellant] he is about 6 [feet] tall and is about 300 pounds has a big brown and grey beard and [wears] round [glasses] and skull cap, black leather jacket and jeans. He drives [a 1982] Ford pickup I don't know [what] color. So Saturday I went to get my 22 pistol

and it was gone, I [thought] I would load it and put it on my [night] table in case he comes back[;] at least I would have some protection[.] I ask[ed] Teri [where] the gun was [and] she said she didn't know. I said it was on my dresser. She said she didn't take it[.] I said there [was] just [she and I] here and I didn't take it so [where] did it get to[?] The guy told me he was a [convicted] felon [and] he also had on rubber gloves so he didn't leave finger prints [anywhere]. So I am thinking that maybe she gave him the gun to kill me with. That way no one would think [someone] killed me[,] that I [committed suicide]. Seeing it was my gun. So that is why I am writing this letter[,] in case I should end up shot by a 22 pistol. So nobody would think it was nothing but a suicide. I am going to put the letter I found with this letter. So if anything happens you have something to show the right people.

[Signed] Robert SANDT.

N.T., 4/27/04, at 119–123 (quotation marks and A.D.A.'s questions omitted).

■■■ In reviewing claims averring violations of the hearsay rule we are guided by the following.

The hearsay rule provides that evidence of a declarant's out-of-court statements is generally inadmissible because such evidence lacks guarantees of trustworthiness fundamental to the Anglo—American system of jurisprudence. Hearsay evidence is presumed to be unreliable because the original declarant is not before the trier of fact, and therefore, cannot be challenged as to the accuracy of the information conveyed. Exceptions to the hearsay rule are premised on circumstances surrounding the utterance which enhance the reliability of the contents of the utterance, and render unnecessary the normal judicial assurances of cross examination and oath.

*Commonwealth v. Priest,* 18 A.3d 1235, 1241 (Pa.Super.2011).

Upon review, we agree with Appellant that the letter constitutes hearsay. In its opinion following the hearing on Appellant's omnibus pretrial motion, the trial court also agreed the letter was hearsay and therefore the "letter will be excluded from evidence for purposes of proving the truth of the matter asserted, that being that [Appellant] participated in the murder of the victim." Trial Court Opinion, 9/12/03, at 7–8. On appeal, codefendant Levanduski also argued the letter was inadmissible hearsay, and this Court sitting *en banc* thoroughly examined the victim's letter and determined it constituted hearsay. *See Commonwealth v. Levanduski,* 907 A.2d 3, 13–20 (Pa.Super.2006) (*en banc*). Additionally, this Court reviewed the letter in the context of Pennsylvania Rules of Evidence 803 and 804, governing hearsay exceptions, and determined the letter could not be admitted pursuant to any exceptions. *Id.* In the instant matter, this Court's review of the letter and relevant law in this Commonwealth yields the same conclusion. As this issue has already been extensively addressed in codefendant Levanduski's case, we have elected not to reiterate the same analysis in the instant matter. Rather, we direct our disposition of Appellant's claim that the letter is inadmissible hearsay to this Court's prior opinion in *Levanduski. See id.*

■■■ Nevertheless, our disposition of this issue does not end here. We must now, as we did in *Levanduski,* determine whether the admission of the victim's letter was harmless error.

We have identified three scenarios where the erroneous admission of evidence may constitute harmless error.

Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis;* (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Atkinson,* 987 A.2d 743, 751–52 (Pa.Super.2009).

*Commonwealth v. Charleston,* 16 A.3d 505, 529 (Pa.Super.2011).

In *Levanduski* this Court reached its conclusion that the introduction into evidence of the letter was harmless error after applying the facts before it to the following legal standard.

Despite the decided inadmissibility at trial of [the victim's] letter, "Not all violations of the accused's right to confront his witnesses result in reversible error. The appropriate standard for review under these circumstances is the harmless error test as set forth in *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978)." *Commonwealth v. Marinelli,* 547 Pa. 294, 328, 690 A.2d 203, 220 (1997), *cert. denied,* 523 U.S. 1024, 118 S.Ct. 1309, 140 L.Ed.2d 473 (1998). This Court commented on the harmless error test stating: "Not all errors at trial, however, entitle an appellant to a new trial, and [t]he harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial...." *Commonwealth v. West,* 834 A.2d 625, 634 (Pa.Super.2003), *appeal denied,* 586 Pa. 712, 889 A.2d 1216 (2005) (quoting *Commonwealth v. Drummond,* 775 A.2d 849, 853 (Pa.Super.2001), *ap-*

*peal denied,* 567 Pa. 756, 790 A.2d 1013 (2001) (internal citations and quotations omitted)).

*Levanduski, supra* at 21.

Furthermore, in *Commonwealth v. Moore,* 594 Pa. 619, 937 A.2d 1062, 1073 (2007), *cert. denied, Moore v. Pennsylvania,* 555 U.S. 969, 129 S.Ct. 452, 172 L.Ed.2d 326 (U.S.2008), our Supreme Court clarified this standard.

We recognize that the Commonwealth has the burden of proving beyond a reasonable doubt that the error could not have contributed to the verdict, *see Commonwealth v. Mitchell,* 576 Pa. 258, 280, 839 A.2d 202, 214 (2003), and that it does not offer a harmless error argument in its brief. Nonetheless, an appellate court may affirm a valid judgment based on any reason appearing as of record, regardless of whether it is raised by the appellee. *See Commonwealth v. Parker,* 591 Pa. 526, 534–35, 919 A.2d 943, 948 (2007). **An error may be deemed harmless,** *inter alia,* **where the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.** *See Commonwealth v. Young,* 561 Pa. 34, 85, 748 A.2d 166, 193 (1999).

*Moore, supra* at 1073 (emphasis added).

 Herein, Appellant claims "the jurors had to believe all the statements contained in [the victim]'s letter in order to determine motive on the part of the Appellant." Appellant's Brief at 15. Specifically, as stated previously, Appellant argues,

[the victim's] letter discusses many things such as the relationship between Appellant and Ms. Levanduski, the missing .22 pistol, Ms. Levanduski's desire to end her relationship with [the victim], and the division of marital property.

The letter itself does not prove the relationship between Appellant and Ms. Levanduski and it certainly does not establish Appellant's motive to kill Mr. Sandt. It is obvious that the jurors had to believe all of the statements contained in [the victim's] letter in order to determine motive on the part of the Appellant to participate in [the victim's] murder. The letter by [the victim] is clearly under the Pennsylvania Rules of Evidence and therefore only admissible if it meets an[ ] exception to the hearsay rule as listed in Pa.R.E. 803.

*Id.* at 14–15.

In an effort to demonstrate Levanduski's similar claim lacked merit, this Court in *Levanduski* created a chart referencing trial testimony where the averments made in the letter were presented through independent, competent evidence. *See Levanduski, supra* at 21. This chart demonstrated that the evidence in the letter "was merely cumulative of other untainted evidence." *Id.* at 22; *see also Charleston,* at 529. In the case *sub judice,* each of the matters that Appellant claims were presented solely through the victim's letter were presented elsewhere at Appellant's trial through competent, independent evidence.

First, Appellant's claim that the letter was the only source of evidence of the missing .22 caliber pistol is belied by the record. On direct examination, Officer Miller was asked if co-defendant Levanduski ever mentioned the victim having a gun or a revolver. Officer Miller testified as follows.

A. Yes. Miss Levanduski stated specifically regarding a handgun she said that [the victim] and her were having trouble; it was a volatile relationship. She said that there was a revolver in the house. It was silver or chrome, and it was an older gun. Specifically it was a description she gave Detective Schmidt

and myself in an interview of the handgun. She indicated that because it was a volatile relationship and they were having problems, [the victim] could be mean. She took the gun out of the house two months prior to this incident.

N.T., 4/28/04, at 16–17. Additionally, Michael Hryor, Appellant's housemate in New Jersey, testified that Appellant showed him "a silver .22 caliber single action revolver with a black handle with a right hand twist." *Id.* at 78. When asked where Appellant obtained the gun, Michael Hryor replied, "Teri gave it to him." *Id.* He further testified that Appellant had shown him the gun "at least a good month before[ ]" Appellant was arrested. *Id.*

Next, Appellant claims the letter was the only evidence of a relationship between himself and Levanduski. As previously addressed in issue one, extensive letters exchanged between Appellant and Levanduski were recovered as part of this investigation. The letters contain intimate details of the relationship between the two. Additionally, there were several graphic photographs of Appellant and Levanduski that accompanied the letters found in the dumpster. *Id.* at 173. In fact, Appellant's counsel objected to the introduction of the photographs arguing, "[i]f the purpose is to show the relationship between [Appellant] and Miss Levanduski, they have done so already with other evidence in the form of letters and cards and whatnot." *Id.* at 174. He continued, "[i]f the purpose is to show some sexual perversity or something of that nature, it is not relevant to the case. So I don't know what their purpose is other than to show a relationship which already has been established." *Id.* Furthermore, Michael Hryor, John Hryor, Lyda Boyd, and Charlotte Stevens, all witnesses familiar with Appellant, testified that Appellant and Levanduski were involved in a romantic relationship and com-

municated often. *See id.* at 75–76, 85–86, 106, and 120.

Appellant's third contention is that the letter is the only evidence of the deterioration of the relationship between the victim and Levanduski. As already mentioned in conjunction with Appellant's first contention, Detective Miller testified that Levanduski stated her relationship with the victim was volatile. *Id.* at 16. Additionally, John Hryor, another housemate of Appellant's testified that he knew Appellant was in a relationship with Teri, and that Teri "lived with a guy." *Id.* at 85. John Hryor testified that Appellant stated the guy Teri lived with "was not a very nice person. I guess he didn't treat her well." *Id.* at 85–86.

Finally, regarding the deterioration of Levanduski's relationship with the victim, Appellant made several references to the victim's treatment of Levanduski in the letters they exchanged. In one particular excerpt, Appellant wrote to Levanduski expressing the following feelings.

> I know he would never talk to you like that ever again after I talked to him, if he could talk. (I know this letter isn't helping) [w]hen I hear you on the verge of tears telling me you only have a few minutes, I get a big knot in my heart and I feel all the anguish you are suffering. Baby I need you, want you and most of all love you with all of my heart. I can't be the only one who knows how he treats you. If he is [sic] been this way this long, you have grounds for a divorce, on the grounds of mental cruelty.
>
> If he's hit you before, then you can have him removed and restrained because you fear for your health. I'm worried for you. Your sanity as well as the rest.

*Id.* at 184. Accordingly, there was ample evidence of the deterioration of this relationship.

The last contention Appellant has with the victim's letter is that it was the only evidence regarding a division of marital property being an issue between the victim and Levanduski. The Commonwealth, through the testimony of Detective Wolbert, presented evidence of a letter Appellant wrote to Levanduski in which he proclaimed the following to her.

> I want you now, just like the first time I told you I love you. You are the only thing on my mind day and night. I know how much love is here for you and all of the things you have are not on my mind. Sorry, it's just you that I care about. As far as I'm concerned, you could be on the street. Those possessions are yours, but you are mine, until a day that you decide it isn't that way.

*Id.* at 185. On cross-examination, defense counsel asked Detective Wolbert about this letter stating, "Okay. You would agree with me the only person—that Teri Levanduski had a financial stake in her relationship with [was the victim] or she believed she did?" *Id.* at 201. Detective Wolbert answered that was correct and that Levanduski believed she and the victim owned joint property, and Appellant's letter indicated he wanted her not to worry about losing it.

Based on the foregoing, as in *Levanduski*, we "decline to disturb the jury's verdict on this basis." *Id.* We agree that all of the averments Appellant claims were introduced solely through the letter were presented to the jury through other independent evidence and that the letter was merely cumulative of other untainted evidence. Moreover, a review of the entire trial transcript reveals the jury was presented with overwhelming evidence of Appellant's guilt. Therefore, the trial court's admission of the victim's letter, while hearsay, constituted harmless error.

██ In his third issue, Appellant avers the trial court erred by allowing Detective Richard Wolbert to testify to inadmissible hearsay, or alternatively, in failing to give a curative instruction to the jury.[14] Appellant's Brief at 18. Specifically, Appellant argues the evidence at trial revealed that there were no guns registered to the victim and that the only evidence the victim "had a gun came solely from the hearsay report of Detective Wolbert[.]" *Id.* Appellant avers this was admitted for the truth of the matter asserted and to "establish that something in the letter written by [the victim] was true to bolster the credibility of the remainder of the statements which implicated [ ] Appellant[.]"[15] *Id.* at 18–19.

The testimony Appellant avers was inadmissible hearsay was elicited by the Commonwealth on redirect examination following the defense's "as of cross-examination" of Detective Wolbert.[16] Detective Wolbert was first called on April 28, 2004, to testify for the Commonwealth, and he was recalled by the Commonwealth the following day. On April 30, 2004, the Commonwealth rested, and the defense proceeded to present its case-in-chief. The defense called Detective Wolbert and requested permission to question him "as of cross." N.T., 4/30/04, at 52. The trial court granted this request.

A brief discussion of the limits of "as of cross" is essential to our review of Appellant's claim. This Court has explained these limits as follows.

The trial judge has wide discretion in controlling the use of leading questions. The court's tolerance or intolerance for leading questions will not be reversed on appeal absent an abuse of discretion.

We also recognize that there is a difference between (1) calling a witness as on cross in the first instance, and (2) requesting permission to treat a witness as hostile. **A party may call her adversary as a witness, as on cross-examination, and put leading questions to the witness, and draw from the adversary's testimony those facts or admissions which weaken the adversary's case or strengthen the case of the calling party.**

*Commonwealth v. Lambert,* 765 A.2d 306, 360 (Pa.Super.2000) (citations omitted; emphasis added).

With this principle in mind, we note that under the Pennsylvania Rules of Evidence, leading questions are permitted under certain circumstances.

(c) **Leading questions.** Leading questions should not be used on the direct or redirect examination of a witness except as may be necessary to develop the wit-

---

**14.** Appellant's brief fails to develop an argument in support of his averment that the trial court failed to give a curative instruction. Appellant has not cited to a place in the certified record where such instruction was requested, nor has Appellant cited any relevant caselaw discussing the trial court's discretion in determining jury instruction issues. As Appellant has completely failed to develop this portion of his claim, we conclude it is waived for purposes of our review. *See Einhorn, supra* at 970 (concluding, *inter alia,* that a claim was waived for failure to direct this Court's attention to that part of the record substantiating his claim); *see also* Pa.R.A.P. 2119(c), **Argument; Reference to record.**

**15.** We note with disfavor that Appellant has also failed to cite to any relevant case law in support of his position that Detective Wolbert's testimony was inadmissible hearsay. *See* Pa.R.A.P. 2119(a) (stating, "[t]he argument shall be divided into as many parts as there are questions to be argued ... followed by such discussion and citation of authorities as are deemed pertinent[ ]").

**16.** "As of cross-examination" is also referred to "as on cross-examination" in criminal cases in this Commonwealth. *See Commonwealth v. Lambert,* 765 A.2d 306, 361 (Pa.Super.2000).

ness' testimony. Ordinarily, leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party **or a witness identified with an adverse party, interrogation may be by leading questions; a witness so examined should usually be interrogated by all other parties as to whom the witness is not hostile or adverse as if under redirect examination.**

Pa.R.E. Rule 611(c) (emphasis added).

 In other words, Rule 611(c) states once a party is permitted to examine a witness by asking leading questions, the opposing party should be permitted to examine the witness as if they are on redirect. "The scope of redirect examination is largely within the discretion of the trial court." *Commonwealth v. Dreibelbis*, 493 Pa. 466, 426 A.2d 1111, 1117 (1981). "An abuse of discretion is not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law." *Commonwealth v. Hoover*, 16 A.3d 1148, 1150 (Pa.Super.2011) (citations omitted). "Moreover, when a party raises an issue on cross-examination, it will be no abuse of discretion for the court to permit re-direct on that issue in order to dispel any unfair inferences." *Dreibelbis, supra* at 1117. "Furthermore, when a 'trial court indicate[s] the reason for its decision our scope of review is limited to an examination of the stated reason.'" *Commonwealth v. Davis*, 17 A.3d 390, 395 (Pa.Super.2011), *quoting Commonwealth v. Sanchez*, 848 A.2d 977, 984 (Pa.Super.2004) (citations omitted).

In the instant matter, defense counsel asked Detective Wolbert the following questions during his "as on cross" testimony.

[Q.] Detective Wolbert, you are the lead investigator for this case, correct?

[A.] Yes, sir.

. . .

[Q.] Okay. Did you search for a record indicating a pistol owned by [the victim]?

[A.] Yes.

[Q.] And did you recover any record of a pistol owned by [the victim]?

[A.] No, sir.

. . .

[Q.] Now, you testified yesterday that Miss Levanduski never made a report of domestic violence, correct?

[A.] Correct.

[Q.] Did [the victim] ever make a report of a missing gun?

[A.] No, sir, he did not.

N.T., 4/30/04, at 53–55.

In response to the defense's line of questioning, the Commonwealth proceeded to ask Detective Wolbert the following questions.

[Q.] You were asked on direct examination whether or not [ ] you were able to trace whether a pistol was owned by [the victim]?

[A.] Yes.

[Q.] And you said you did not receive any records of that; is that correct?

[A.] Correct.

[Q.] During the course of your investigation, did you receive information on how [the victim] may have acquired the gun?

[A.] Yes, from his father.

[Q.] And why do you say that?

[A.] I spoke to the family members.

[Defense Counsel]: Objection.

[A.D.A.]: The question of the gun registration was based on his role as lead investigator and not called for as a hearsay response. This is similar in nature.

[The Court]: Overruled.

[Q.] So you spoke to the family of whom?

[A.] The victim[.]

[Q.] And what information did you receive in that regard?

[A.] That the handgun was his father's and was given to him by his father.

*Id.* at 61–62.

The trial court explained its reasoning for allowing the line of questioning as follows.

> At trial, Detective Wolbert was called by defense counsel "as of cross-examination" at which time counsel questioned him about the ownership of a pistol belonging to [the victim]. Detective Wolbert testified that he searched for a record indicating that [the victim] owned a pistol but found none. Detective Wolbert further testified that he received information from [the victim's] family members that [the victim] had acquired the pistol from his father. The testimony reveals that Detective Wolbert, through his role as lead investigator into the death of [the victim] and in furtherance of his investigation into the ownership of a pistol, learned from family members that [the victim] owned a handgun which had been handed down to him by his father. [Appellant] alleges that the trial court committed error in allowing "hearsay" testimony regarding the ownership of a pistol. It is true that Detective Wolbert obtained information regarding [the victim's] ownership of a pistol from [the victim's] family when he was unable to find any public records. However, it was defense counsel who opened the door to this line of questioning, not the Commonwealth.

Trial Court Opinion, 5/24/10, at 4–5 (citations omitted).

 Our independent review of the transcripts in this matter leads us to conclude the trial court did not err by allowing the Commonwealth to question Detective Wolbert regarding his knowledge of whether the victim possessed a pistol. The Commonwealth's questions were within the scope of the defense's questions "as on cross" and were allowed by the trial court to clarify for the jury the full extent of Detective Wolbert's investigation. The Commonwealth did not ask Detective Wolbert about his investigation into the pistol on direct examination in their case-in-chief. The defense, during the as on cross-examination of Detective Wolbert, opened the door into the subject of his investigation into the pistol, permitting the Commonwealth to ask more questions to complete the record. As a result, we conclude the trial court did not abuse its discretion by allowing Detective Wolbert to testify to his knowledge of the pistol.

 In his final issue, Appellant avers the trial court erred by allowing Jackie Sandt to testify because she had not been sequestered during the testimony of Trooper Philip Barletto. Appellant's Brief at 20. Specifically, Jackie Sandt testified to the identification of her father's handwriting and then was asked to read the victim's letter into evidence. *See* N.T., 4/27/04, at 119–123. Appellant merely argues that Trooper Barletto testified in part about recovering the letter from the victim's home. Appellant's Brief at 20. Appellant contends that the trial court "never made a determination as to the impact of the testimony of the witness on the outcome of the trial when the witness testified immediately following the testimony of Trooper Barletto." *Id.* Of note, Appellant fails to specify how this testimony's impact would have an unfair effect on the trial.

Preliminarily, our review reveals no evidence in the record that the defense ever objected to Sandt remaining in the courtroom during Trooper Barletto's testimony. Additionally, there is no evidence the defense requested that Sandt be sequestered

during the trial.[17] More importantly, Appellant does not even attempt to argue in his brief that a request was ever made. In light of the fact that the record reflects there was no sequestration order entered in this case, we conclude the case law Appellant cites in his brief is inapplicable. *See* Appellant's Brief at 19–20 (setting forth three cases dealing with sanctions for violating sequestration orders).

Furthermore, Sandt was asked the following questions.

[Q.] Ma'am, I am going to show you what has already been admitted into evidence as Commonwealth's Exhibit No. 25. This Commonwealth's 25. It has been identified as a handwritten note that was torn in quarters that was retrieved in the garbage of your father's residence. I'd ask you, ma'am, to review it. I believe it is in the order that the pages are numbered on top, but please review it. And I ask if you can identify whose handwriting that is.

[A.] Yeah, that is my dad's handwriting.

[Q.] Are you sure?

[A.] Yes.

N.T., 4/27/04, at 117–118. We fail to discern how Sandt's testimony would be impacted by hearing Trooper Barletto's testimony. Therefore, as Appellant has failed to develop an argument we are constrained to find his issue waived. *See Einhorn, supra* at 970 (concluding, *inter alia*, that a claim was waived for failure to direct this Court's attention to that part of the record substantiating his claim); *see also* Pa. R.A.P. 2119(c), **Argument; Reference to record.** Therefore, Appellant's fourth issue fails.

Accordingly, we conclude that (1) the trial court did not violate the mandates of *Bruton* by allowing Detective Miller to testify regarding statements Teri Levanduski made solely regarding her involvement in the victims murder; (2) the trial court erred by admitting the victim's letter into evidence as it constituted hearsay, but the error was harmless; (3) the trial court did not err in allowing Detective Wolbert to testify on redirect examination to the details of his investigation pertaining to the victim's missing pistol after the defense opened the door to such questioning; and (4) the trial court did not err in allowing Jackie Sandt to testify to her knowledge of her father's handwriting over defense counsel's objection. Based on our conclusion that each of Appellant's issues are either devoid of merit or waived, we affirm Appellant's July 21, 2004 judgment of sentence.

Judgment of sentence affirmed.

Judge MUSMANNO files a Concurring Opinion in which Judge PANELLA joins.

Judge LAZARUS files a Concurring Opinion in which Judge MUSMANNO joins.

CONCURRING OPINION BY
MUSMANNO, J.:

I concur in the result reached by the Majority. However, I am troubled by the admission into evidence of the victim's letter, which clearly is inadmissible hearsay.

CONCURRING OPINION BY
LAZARUS, J.:

I concur with the result reached by the Majority based upon the meticulous opinion authored by my colleague, Judge Mundy. In her decision, she adeptly sets forth the *quantum* of evidence which is necessary to overcome the prejudice from the

---

**17.** The trial transcript reveals Sandt was sequestered at the preliminary hearing. N.T., 4/27/04, at 114. There is no evidence, however, that a request was made to sequester her at the start of trial.

victim's letter, which is clearly hearsay, and make its admission harmless error.