J. S57013/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| DYER McCALL, | : | No. 1497 WDA 2015 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, September 10, 2015,
in the Court of Common Pleas of Clearfield County
Criminal Division at No. CP-17-CR-0000670-2014

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN AND STRASSBURGER,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED AUGUST 19, 2016**

Dyer McCall appeals from the September 10, 2015 aggregate judgment of sentence of 90 days' to one-year imprisonment, plus one year of consecutive probation, imposed after a jury found him guilty of one count of driving under the influence of a controlled substance ("DUI") and multiple summary driving offenses.[1]  After careful review, we affirm.

The relevant facts and procedural history of this case are as follows. On June 10, 2014, at approximately midnight, Pennsylvania State Police Trooper Brian A. Elensky ("Trooper Elensky") stopped appellant's vehicle after he observed it cross over the center line of State Route 879 multiple

---

* Retired Senior Judge assigned to the Superior Court.

[1] 75 Pa.C.S.A. §§ 3802(d)(2) , 1311, 1786, 3309, and 3714, respectively.

times. (Notes of testimony, 5/22/15 at 31-32.) After approaching the vehicle, Trooper Elensky observed that appellant was holding a pill bottle and appeared to be drowsy and "somewhat confused." (*Id.* at 34-35, 41.) Based upon his observations, Trooper Elensky asked appellant to exit his vehicle to perform field sobriety tests. (*Id.* at 36.) During testing, Trooper Elensky observed that appellant exhibited multiple signs of impairment. (*Id.*) Specifically, Trooper Elensky noted that appellant "swayed" during testing, "was unable to do the [one-leg-stand-test] on one foot," was not very alert, and his balance, memory, and coordination were very poor. (*Id.* at 37-38, 41-42.) Trooper Elensky testified that later that evening, appellant informed him he had consumed buprenorphine, clonazepam, Keppra, and 10 milligrams of Oxycodone to help him sleep better. (*Id.* at 38-40.) Appellant also indicated to Trooper Elensky that he suffered from seizures and pain due to prior head and shoulder injuries and that he did not have a current prescription for Oxycodone. (*Id.* at 39, 67, 88.) Following his arrest, appellant was transported to Clearfield Hospital and consented to a blood test. (*Id.* at 52-53.) The results of appellant's blood test were analyzed by NMS Laboratories ("NMS Labs"), which prepared a toxicology report detailing its findings. (*Id.* at 54.)

On September 16, 2014, appellant was charged with three counts of DUI of a controlled substance or its metabolites[2] and multiple summary driving offenses. Appellant proceeded to a jury trial on May 22, 2015. At trial, appellant introduced the entirety of a 1,017-page litigation support packet prepared by NMS Labs ("NMS packet"). (*Id.* at 141-142.) The NMS packet detailed the analytical test data generated from the analysis of appellant's blood sample. (*Id.*) Following a one-day trial, appellant was found guilty of one count of DUI in violation of Section 3802(d)(2) and multiple summary driving offenses. Appellant was found not guilty of DUI -- schedule II or III controlled substance, DUI -- metabolite of a controlled substance, and the summary offense of reckless driving.[3] As noted, appellant was sentenced to an aggregate term of 90 days' to one-year imprisonment, plus one year of consecutive probation, on September 10, 2015. On September 14, 2015, appellant filed a post-sentence motion for bail pending appeal, which was granted by the trial court the following day. This timely appeal followed on September 29, 2015.[4]

On appeal, appellant raises the following issues for our review:

> 1.   [Whether t]he [t]rial [c]ourt erred when it barred [appellant's c]ounsel from arguing its theory of the case by preclud[ing appellant's

---

[2] A "metabolite" is a by-product of the body's metabolism, or digestion, of a chemical.

[3] 75 Pa.C.S.A. §§ 3802(d)(1)(ii), 3802(d)(1)(iii) and 3736, respectively.

[4] Appellant and the trial court have complied with Pa.R.A.P. 1925.

c]ounsel from making arguments to the jury at closing about evidence that was properly put into the record that exposed errors in the Commonwealth's theory of impairment as well as serious issues in the analytical test results that also casted [sic] doubt on the Commonwealth's theory of impairment when [appellant's c]ounsel's arguments did not create or introduce new evidence at closing but would have merely exposed flaws in the Commonwealth's case based on testimony and evidence already put into the record[?]

2. [Whether t]he [t]rial [c]ourt erred as a matter of law when it allowed the test results of oxymorphone[5] to be introduced by the Commonwealth in violation of 75 Pa.C.S.A. [§] 1547(c)(4) as oxymorphone does not have the required minimum detection level set by the Department of Health which is a prerequisite for admissibility of Schedule II drugs or their metabolites[?]

Appellant's brief at 2.

The crux of appellant's first claim is that the trial court erred in sustaining the Commonwealth's objection to a portion of his counsel's closing argument. Specifically, during his summation, appellant's counsel attempted to dispute the quantity of Oxycodone and the other controlled substances found in appellant's blood by displaying and referencing a Quantitative Analysis Sample Report ("QAS report") appearing on page 312 of the 1,017-page NMS packet. (Notes of testimony, 5/22/15 at 224-225;

---

[5] We note that oxymorphone is an active metabolite of Oxycodone, and causes the same spectrum of effects caused by Oxycodone. (Notes of testimony, 5/22/15 at 122.)

*see also* appellant's "Exhibit E.")  At sidebar, the Commonwealth objected on the basis that appellant's counsel had failed to cross-examine its expert witness with regard to the QAS report and that referencing the forensic data contained therein would confuse the jury.  (***Id.*** at 226.)  Appellant's counsel, on the contrary, argued that a proper foundation was laid when he introduced the NMS packet into evidence and that he should be permitted to argue issues relating to this data.  (***Id.*** at 225-226.)  Following further discussion, the trial court ruled that it was excluding this portion of counsel's closing.  (***Id.*** at 227.)  In so ruling, the trial court reasoned as follows:

> All I can say is that notwithstanding what [appellant's counsel] may have presented or what [the forensic toxicologist] may have said, that I cannot make heads or tails out of this [QAS report]. It does say something about qualifier and ratio, qualifier ratio to uses some material to confirm, and it says down at the bottom Oxycodone, and there's [sic] numbers.  I have no idea what those mean.  And it says path/review and it says review. And then these buprenorphine, okay, morphine, it says, past.  But my recollection is in regard to that buprenorphine, that that was beyond the reportable limits.
>
> . . . .
>
> All this should have been asked to the witness. You're just pulling this out of the blue.  And I think if I allow you to do this, you are then testifying.  So I am going to exclude this.
>
> . . . .
>
> I understand you object.  But it's totally confusing.  It's out of context.  I don't believe it's sufficiently related to what you asked her, including

> you should have pulled [the QAS report] out and asked the witness about that [forensic data]. Okay.

*Id.* at 226-228.

Appellant contends that the trial court abused its discretion in precluding his counsel from drawing a reasonable inference from this forensic data that the quantity of Oxycodone, oxymorphone, and clonazepam found in his blood were suspect. (Appellant's brief at 12-13.) Appellant further argues that his counsel should have been permitted to draw a reasonable inference "that there was buprenorphine in [a]ppellant's blood and that could have negated the effects of the opioids in his system." (*Id.* at 14.) Lastly, appellant avers that this data shows that his "poor driving and test results are equally as likely to be because of [his] physical condition due to his brain injury and neurological conditions." (*Id.*)

"[T]he admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Fransen*, 42 A.3d 1100, 1106 (Pa.Super. 2012), *appeal denied*, 76 A.3d 538 (Pa. 2013) (citation omitted). "An abuse of discretion is not merely an error of judgment; rather discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record." *Commonwealth v. Antidormi*, 84 A.3d 736, 745 (Pa.Super. 2014), *appeal denied*, 95 A.3d 275 (Pa. 2014) (citation omitted).

Instantly, our review of the record reveals that there was no evidentiary basis for appellant's counsel to display or reference the forensic data contained in the QAS report during his closing argument. At trial, the Commonwealth presented the testimony of Donna Papsun ("Papsun"), an expert in the field of forensic toxicology who reviewed appellant's toxicology report for NMS Labs. (Notes of testimony, 5/22/15 at 111-114.) Papsun testified at great length with regard to the combination of drugs found in appellant's system and the analytical test data generated from the analysis of appellant's blood sample. (*Id.* at 117-168.) Papsun further testified that she reviewed all of the data contained in the NMS packet and had "no reason to believe there's [sic] any problems based on full review of the screening and confirmation testing." (*Id.* at 142-144.) During cross-examination of Papsun, appellant's counsel asked her a number of general hypothetical questions on chromatography[6] and the various identification and quantification problems that can occur. (*Id.* at 144-151.) However, at no point during this cross-examination did counsel ever question Papsun with regard to any of the forensic data set forth in the QAS report or chromatogram that appeared on page 312 of the 1,017-page NMS packet. Additionally, Papsun did not refer to, interpret, or explain any of the QAS report's data during her direct examination.

---

[6] "Chromatography" is the technique of separating and analyzing the components of a controlled substance to determine quantity.

Generally speaking, counsel's statements during closing argument "must . . . be based upon matters in evidence and/or upon any legitimate inferences that may be drawn from the evidence." ***Commonwealth v. Keaton***, 45 A.3d 1050, 1074 (Pa. 2012) (citation omitted); ***see also Commonwealth v. Johnson***, 42 A.3d 1017, 1039 (Pa. 2012), ***cert. denied***, 133 S.Ct. 1795 (2013) (concluding that counsel's remarks during summation should contain "fair deductions and legitimate inferences from the evidence presented during the testimony." (citation omitted)).  This court has long recognized that "counsel may reasonably display exhibits which are in evidence and may use such exhibits demonstratively as long as the demonstration is for illustration purposes **and does not constitute the creation of new evidence**." ***Commonwealth v. Wise***, 444 A.2d 1287, 1290 (Pa.Super. 1982) (emphasis added).  Here, we agree with the trial court that permitting appellant's counsel to utilize or reference the QAS report's forensic data during his summation would have resulted in the jury being exposed to new and potentially confusing evidence it did not hear during trial.  (***See*** trial court opinion, 12/22/15, at 4.)  Accordingly, we find the trial court did not abuse its discretion in sustaining the Commonwealth's objection to the aforementioned portion of appellant's counsel's closing argument.

In any event, even if we were to determine that the trial court's decision to preclude counsel from utilizing the aforementioned QAS report

during his closing argument was improper, any error in this regard was harmless based upon the overwhelming evidence of appellant's guilt. Harmless error exists where, *inter alia*, "the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Commonwealth v. Atkinson*, 987 A.2d 743, 752 (Pa.Super. 2009), *appeal denied*, 8 A.3d 340 (Pa. 2010) (citation omitted).

Instantly, appellant was found guilty of one count of DUI in violation of § 3802(d)(2). Section 3802(d)(2) provides as follows:

> **(d) Controlled substances.--**An individual may not drive, operate or be in actual physical control of the movement of a vehicle under any of the following circumstances:
>
> . . . .
>
> (2) The individual is under the influence of **a drug or combination of drugs** to a degree which impairs the individual's ability to safely drive, operate or be in actual physical control of the movement of the vehicle.

75 Pa.C.S.A. §§ 3802(d)(2) (emphasis added).

Under this section, the Commonwealth must demonstrate that an appellant was under the influence of a drug or combination of drugs at the time he was stopped to such a degree that his ability to safely drive was

- 9 -

impaired. *See **Commonwealth v. Etchison***, 916 A.2d 1169, 1172 (Pa.Super. 2007), *affirmed*, 943 A.2d 262 (Pa. 2008). "Section 3802(d)(2) **does not** require that any amount or specific quantity of the drug be proven in order to successfully prosecute under that section." ***Commonwealth v. Williamson***, 962 A.2d 1200, 1204 (Pa.Super. 2008), *appeal denied*, 980 A.2d 608 (Pa. 2009); *compare*, *e.g.*, 75 Pa.C.S.A. § 3802(a) (requiring that an individual's alcohol concentration in his or her blood or breath be at least 0.08% to be convicted).

Here, appellant freely admitted at trial that he consumed Oxycodone between 10:00 and 10:30 a.m. the day he was pulled over. (Notes of testimony, 5/22/15 at 191, 200.) Trooper Elensky, in turn, testified that appellant informed him that he took 10 milligrams of Oxycodone approximately 4 hours before the stop in question, at approximately 8:00 p.m. (*Id.* at 39.) Appellant disagreed with Trooper Elensky's timeframe at trial. (*Id.* at 201.) Trooper Elensky also noted that appellant informed him he had consumed buprenorphine, clonazepam, and Keppra. (*Id.* at 38-40.) The toxicology report introduced at trial revealed that appellant's blood contained the following controlled substances: clonazepam; 7-amino clonazepam; alprazolam; Oxycodone-Free or Oxycodone, which is essentially OxyContin or Percocet; oxymorphone; and levetiracetam, which is also known as Keppra. (*Id.* at 117-118.)

Further, Papsun opined in her capacity as an expert in forensic toxicology that the controlled substances found in appellant's system, or any combination thereof, would impair one's ability to drive. (*Id.* at 124-129.) Additionally, Trooper Elensky testified that appellant demonstrated multiple signs of impairment on the evening in question, including "very slow" speech and poor balance, alertness, memory and coordination. (*Id.* at 37-38, 41-42.) Trooper Elensky, a six-year veteran of the Pennsylvania state police who has been involved in over 50 DUI arrests relating to controlled substances, testified that based on his training, experience, and observations of appellant, it was his opinion that he was not capable of safely operating a motor vehicle. (*Id.* at 27-29, 57.) Accordingly, for all the foregoing reasons, appellant's first claim of trial court error must fail.

Appellant next argues that the trial court erred in admitting his test results for oxymorphone into evidence, as the Department of Health has not set a minimum detection level for its admissibility, pursuant to 75 Pa.C.S.A. § 1547(c)(4). (Appellant's brief at 14-16.) We disagree.[7]

The admissibility of chemical testing in DUI cases is governed by 75 Pa.C.S.A. § 1547(c). "The purpose behind [Section 1547(c)] is to outline the necessary regulations and procedures that have been approved in this

---

[7] As discussed, appellant was acquitted of, *inter alia*, § 3802(d)(1)(iii), the DUI subsection specifically related to oxymorphone, which is an active metabolite of Oxycodone, but the Commonwealth also included this substance in the "combination of drugs" for purposes of the DUI offense for which appellant was guilty, § 3802(d)(2).

Commonwealth for chemical test results to be admissible in relevant legal proceedings." ***Williamson***, 962 A.2d at 1204. Section 1547(c)(4) directs the Department of Health to establish minimum levels of controlled substances required to be present in admissible test results. This section provides as follows:

> **(c) Test results admissible in evidence.--**In any summary proceeding or criminal proceeding in which the defendant is charged with a violation of section 3802 or any other violation of this title arising out of the same action, the amount of alcohol or controlled substance in the defendant's blood, as shown by chemical testing of the person's breath or blood, which tests were conducted by qualified persons using approved equipment, shall be admissible in evidence.
>
> . . . .
>
> (4) For purposes of blood testing to determine the amount of a Schedule I or nonprescribed Schedule II or III controlled substance or a metabolite of such a substance, the Department of Health shall prescribe minimum levels of these substances which must be present in a person's blood in order for the test results to be admissible in a prosecution for a violation of section 1543(b)(1.1), 3802(d)(1), (2) or (3) or 3808(a)(2).

75 Pa.C.S.A. § 1547(c)(4).

The Department of Health's January 7, 2012 bulletin notes that the purpose of establishing minimum detection levels for controlled substances

is to ensure the reliability of blood test results admitted into court as evidence.

> The minimum quantitation limits listed for each controlled substance or metabolite are the lowest concentrations that one or more of the laboratories with the least sensitive procedures in the Department's approval program for facilities offering these testing services specified they can reliably determine. . . . Confirmatory analyses employed to substantiate the presence of a drug or drug metabolite generally focus on identifying and quantitatively determining the concentration of the parent drug or a primary metabolite if extensive biotransformation occurs. The detection limits listed were developed by reviewing the minimum reportable concentrations for confirmatory analyses that laboratories in the Department's approval program specified they could measure. The concentrations listed are the highest [limits of quantitation] that any of the laboratories approved by the Department to test blood for controlled substance content specify they can reliably determine.

42 Pa.Bull. 110 (Jan. 7, 2012).

Appellant is correct in his assertion that the Department of Health has not set the minimum detection level for oxymorphone. We are unconvinced, however, that the General Assembly intended § 1547(c)(4) to bar from admissibility the test results of any controlled substance that the Department of Health has not yet set a minimum detection level. As noted by the trial court, the Department of Health recognized in its January 4, 2014 bulletin that additional testing may be required for any controlled substance not listed in its notice and directs that "the laboratory performing

the test should be contacted as to the lab's limit of quantitation for any unlisted controlled substance." (Trial court opinion, 12/29/15 at 6.)

> **Although there are hundreds of controlled substances in Schedule I, II and III, quantitation limits are listed only for commonly abused controlled substances for which testing procedures are readily available.** The limit of quantitation (LOQ) for any laboratory will depend on the equipment and procedures employed for confirmatory testing. The minimum quantitation limits listed for each controlled substance or metabolite are the lowest concentrations that one or more of the laboratories in the Department's approval program for facilities offering these testing services specified they can reliably determine. Laboratories approved by the Department to test blood for controlled substances or their metabolites will have LOQs at or below the minimum quantitation limits listed in this notice.
>
> **The Department recognizes that testing may be required for other controlled substances and metabolites not listed in this notice. When testing for a controlled substance not listed is required, interested parties should contact the laboratory performing the test to inquire as to that laboratory's specific method of testing, the equipment used and any policies or procedures employed by that laboratory to ensure that the test results are valid.**

**See** 44 Pa.Bull. 132 (Jan. 4, 2014) (emphasis added).

In the instant matter, Papsun testified at great length with regard to the combination of drugs found in appellant's system and the effect they would have on his body. (Notes of testimony, 5/22/15 at 117-129.) Specifically, Papsun testified that oxymorphone causes the same adverse effects as Oxycodone. (**Id.** at 121-122.) Papsun further noted that the

minimum detection level for oxymorphone at NMS Labs is 1 nanogram per milliliter, and that the level of oxymorphone found appellant's blood was 4.3 nanograms per milliliter. (*Id.* at 123.) Papsun also testified with regard to policies employed by NMS to ensure the reliability of appellant's test results, as well as the specific method of testing and the equipment used. (*Id.* at 114-117, 130-171.) Accordingly, we discern no abuse of discretion on the part of the trial court in overruling appellant's objection to the admission of the oxymorphone test results.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/19/2016