J. S67006/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| SHAHEED WILLIAMS, | : | No. 3275 EDA 2015 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, September 21, 2015,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0003684-2014

BEFORE:  FORD ELLIOTT, P.J.E., RANSOM, J. AND STEVENS, P.J.E.*

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED DECEMBER 16, 2016**

Shaheed Williams appeals from the September 21, 2015 aggregate judgment of sentence of 28 to 56 years' imprisonment imposed after a jury found him guilty of attempted murder, aggravated assault, witness intimidation, criminal conspiracy, and unlawful possession of a firearm.[1] After careful review, we affirm.[2]

The trial court summarized the lengthy factual background of this case as follows:

> On November 22, 2010, on the 2400 block of Turner Street, in Philadelphia, after witnessing Aki Jones place a gun to the head of a juvenile

---

* Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 901, 2702, 4952, 903, and 6105, respectively.

[2] The Commonwealth has not filed a brief in this matter.

female, Michael Vessels called police. Vessels also heard Jones shoot the gun into the air. Jones was arrested the same day.

According to Tiffany Reid (Jones' girlfriend at the time), prior to Jones' preliminary hearing for the gun matter, Jones did not know the identity of the witness against him. Jay Thomas, Jones' friend, was supposed to reach out to Troy Cooper (also known as "Taz") for information on the witness as Cooper and the witness lived on the same block.

On December 13, 2010, Vessels testified at a Preliminary Hearing against Jones. Reid, who was present at the hearing, informed Jones that she saw the witness there. At some point after the preliminary hearing, Cooper informed Jones of Vessels' name and address.

About a week after the preliminary hearing, Cooper approached Vessels and disclosed that the person arrested for shooting the gun was his friend. Cooper told Vessels that he did not need to go to court on this matter. In response, Vessels told Cooper that because he called 9-1-1 the day Jones was arrested, he felt obligated to go to court.

In March or April 2011, Jones, while incarcerated, devised a plan to prevent Vessels from testifying against him. Jones told Reid that, if need be, the witness would be harmed to prevent him from going to court. Jones' plan involved Thomas, whose role was to find Vessels and kill him. At Jones' request, Reid contacted Thomas, and relayed that Jones said to "handle it," referring to the witness, [to] which Thomas replied, "I know, I got it."

In the subsequent months, Cooper approached Vessels numerous times about Vessels not testifying. In one conversation, Cooper told Vessels that Jones' girlfriend would provide $500 for Vessels not to testify. As the conversations about not testifying

increased, Vessels avoided Cooper by entering the neighborhood from different directions.

On September 19, 2011–a week before the start of Jones' trial, scheduled to start on [] September 26–Jones, from prison, instructed Reid to call Thomas in a three-way call. During the three-way call, Jones stated, "Yeah, that's part one. Part one, I was away." Thomas replied, "Yeah. And now we got to get part two out of the way." At trial, Reid testified that "part two," which was always part of the plan, was to find Vessels and to shoot him to ensure that he did not go to court.

On September 23, 2011–just three days before the start of Jones['] trial–in a recorded call between Jones and Reid, Jones stated "Jay [Thomas] gonna be on post." At trial, Reid testified that the term "post" meant that Thomas would wait for Vessels outside of his house to see whether he was going to court.

On this same date, September 23, in another phone call between Reid and Jones, Jones instructed Reid to call Pop Hoagie (Charles Alexander). Reid testified that both Jones and Cooper knew Alexander from the neighborhood. Two days later, on September 25–the day before the scheduled trial– Alexander approached Reid at a basketball court and gave her $500. Approximately fifteen minutes after Reid collected the money, Jones and Reid discussed, in a recorded prison call, the money amount. Jones then directed Reid to give the money to Cooper[.]

. . . .

On September 25, 2011, the day before Vessels was shot on the street, Reid took the money to Cooper's house. While at Cooper's house, Reid spoke with [appellant] and exchanged phone numbers. Reid testified at trial that Jones knew [appellant] as they were from the same neighborhood. After exchanging numbers, [appellant] asked Reid to call him at 6:30 the next morning so that he could stand post outside

Vessels' house. [Appellant] informed Reid that if he saw Vessels going to court, he would kill him.

On the same day that Reid dropped the money off to Cooper, Cooper approached Vessels outside his home and offered him the $500 not to appear in court. Cooper said, "they finally dropped it off," referring to the money. Vessels replied that he could not take it. Cooper responded with, "then it is whatever." Vessels testified at trial that he understood "whatever" to mean "anything goes" and that "if you don't do what I want you to do, then I'm going to do something to you."

The next day, September 26, 2011, at 6:30 a.m., Reid called [appellant]. Reid testified at trial that this was the wake-up call that [appellant] had requested so he could stand post outside Vessels' home. After the wake-up call, there were another four phone calls between [appellant] and Reid, from 7:06 and 9:11 a.m.

That morning, September 26, at around 9:30 a.m., Vessels left his house on the way to meet a member of his church. As he walked to the corner on the next block, [appellant] jumped out, immediately drew a silver revolver, and said, "You like to talk." [Appellant] then placed the gun six inches from Vessels' face and pulled the trigger. Vessels blocked the shot with his wrist. [Appellant] fired again, shooting Vessels in the side. After the second shot, Vessels took off running, with [appellant] in close pursuit. While Vessels ran, [appellant] fired several more shots, striking Vessels in his elbow and back, the latter of which knocked him to the ground. [Appellant] then stood over Vessels, and said[,] "you won't talk no more," and shot Vessels in the neck.

Within a few minutes of the shooting, at 9:45 a.m., [appellant] called Reid. At 9:56 a.m., Reid called [appellant] back. At 9:59 a.m., Reid sent a text message to [appellant], followed by an

- 4 -

exchange of several more text messages. Lastly, at 2:59 p.m., Reid called [appellant].

On the same day, Reid also spoke with [appellant] in person. According to Reid, [appellant] informed her that Vessels did not go to court and described in detail how he had shot him. [Appellant] told Reid that he spotted Vessels leaving his house, dressed like he was ready to go to court. [Appellant] then ran around the corner, up a block, approached Vessels from behind, and shot him. [Appellant] told Reid that Vessels had placed his hand in front of his face and was shot in the arm. He also told Reid that he shot Vessels five times, and that he tried to keep shooting, but the gun jammed.

In January 2012, [p]olice encountered [appellant] and recovered his cell phone. Police retrieved a photograph from the phone which depicted a revolver. At trial, Special Agent Detective Charles Bowman testified that the description of the gun used to shoot Vessels was similar to the photograph of the revolver found on [appellant's] cell phone. Bullet fragments recovered at the shooting scene of Vessels were also consistent with a .38 caliber or 9 millimeter, which are both capable of being fired from a revolver.

On February 14, 2012, the Bureau of Alcohol, Tobacco, Firearms ("ATF") executed a search warrant on Tiffany Reid's home. From her home, federal agents recovered a letter sent to Reid by Jones from prison. The letter was addressed to Lulu Blackchild. (Lulu is Reid's middle name and Jones sometimes referred to her by that name.) Written on the back of the letter was "The date is 5/25/11 and the last letter received from you is 5/18. Payback is fair." At trial, Reid testified that the handwriting was Jones'. Inside the envelope was a transcript of Vessel[s'] preliminary hearing testimony regarding the incident in which Jones had shot a gun into the air.

On November 14, 2012, Vessels identified [appellant] from a photographic array as his shooter. At trial, Vessels again positively identified [appellant].

In March of 2014, Carla Reid received a letter at her home addressed to her daughter, Tiffany Reid. The letter was addressed from another prisoner, Jacque Walker, with a return address from the Philadelphia prison system. Jones was imprisoned with Walker in the same building at the CFCF, and in the same pod (Pod One), at the time the letter was post-marked (March 26, 2014). In the letter, the author threatened Tiffany Reid and her family. Although the letter was not in Jones' handwriting, the author referenced "Zaire" as his son–Jones and Reid's child–and referenced several of Reid's family members by name. The letter was also signed with "A.DoTTTTTT," Jones' nickname. After reading the letter, Carla Reid took it directly to the police.

Jones' letter also references the shooter in the subject crime. Any reference to [appellant's] involvement in the actual shooting of Vessels[] was redacted with neutral phrases. Portions of the letter that potentially exonerated [appellant] were left in with defense counsel's approval.

Trial court opinion, 12/23/15 at 2-8 (citations to notes of testimony and footnotes omitted).

On February 28, 2014, appellant was arrested and charged in connection with this incident. On June 8, 2015, appellant proceeded to a jury trial alongside co-defendant Jones and was subsequently found guilty of the aforementioned offenses on June 15, 2015. On September 21, 2015, the trial court sentenced appellant to an aggregate term of 28 to 56 years' imprisonment. On September 30, 2015, appellant filed a post-sentence

motion arguing that the verdict was against the weight and sufficiency of the evidence, that his right against self-incrimination was violated, and that his aggravated-range sentence should be modified. (**See** "Motion for Post-Sentence Relief," 9/30/15 at ¶¶ I-III.) The trial court denied appellant's post-sentence motion on October 13, 2015. Thereafter, on October 29, 2015, appellant filed a timely notice of appeal. On November 2, 2015, the trial court ordered appellant to file a concise statement of errors complained of on appeal in accordance with Pa.R.A.P. 1925(b). Appellant filed his timely Rule 1925(b) statement on November 23, 2015, and the trial court issued its Rule 1925(a) opinion on December 23, 2015.

On appeal, appellant raises the following issues for our review:

I. Was [a]ppellant deprived of his state and federal constitutional right of confrontation by the admission of statements of a non-testifying co-defendant implicating [a]ppellant in the shooting for which he was charged?

II. Was [a]ppellant deprived of his state and federal constitutional right against self-incrimination when a Philadelphia Police Detective testified that [a]ppellant ended an interview when asked where he was on the day of the shooting that was the subject of the trial?

III. Did the admission of a photograph of a gun allegedly retrieved from [a]ppellant's mobile phone violate [a]ppellant's right of due process guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution?

IV. Did the Commonwealth's attorney violate [a]ppellant's right of due process by referring during closing arguments [] to guilty verdicts reached by other juries in cases unrelated to [a]ppellant's?

V. Did the [trial] court impose an illegal sentence of 20 to 40 years on the charge of [a]ttempted [m]urder when there was no specific finding by the jury that [a]ppellant inflicted serious bodily injury?

Appellant's brief at 4-5.

Appellant first argues that his rights under the Confrontation Clause[3] were violated when the trial court permitted the Commonwealth to introduce a March 26, 2014 letter that Jones wrote to Reid implicating appellant in the shooting. (*Id.* at 14.) Appellant contends that despite the trial court's redaction of his nickname -- Pizza -- from said letter, "it was obvious from the content of the letter and other evidence . . . that Jones was referring to [a]ppellant." (*Id.* at 14, 18-19.) In support of this contention, appellant cites the following three redacted portions of Jones' letter:

Original: How they saying Pizza is the shooter all of a sudden?

Redacted: How they saying **who** shooter all of a sudden?

\*\*\*\*\*\*

---

[3] The Confrontation Clause of the Sixth Amendment, made applicable to the States via the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

| | | |
|---|---|---|
| Original: | | I no you aint tell them people you the one that told Pizza to do that shit. It's in yall phones records dummy. You texted him making sure he out there & all that! |
| Redacted: | | I no you aint tell them people you the one that told **someone** to do that shit. ~~It's in yall phones records dummy. You texted him making sure he out there & all that!~~ |

******

| | | |
|---|---|---|
| Original: | | I talk to Pizza already and I know what's is on his mind. He don't want to believe it is you who is saying name. He will find out and he know my plans with you and he got some n****s that will move too. |
| Redacted: | | I talk to **someone** already and I know what is on **someone's** mind. **Someone** don't want to believe it is you who is saying name. **Someone** will find out and **that person** know my plans with you and **that person** got some [n]**** that will move too. |

*Id.* at 18, citing notes of testimony, 6/11/15, at 217-220 (emphasis in original). Appellant argues that the probative value of this letter is outweighed by its prejudicial impact and challenges the admission of these statements on the grounds that they violated the United States Supreme Court's decision in ***Bruton v. United States***, 391 U.S. 123 (1968), and its progeny. (Appellant's brief at 14-17, 19.) This claim is meritless.

In the seminal case of ***Bruton***, the United States Supreme Court recognized a narrow exception to the general rule that cautionary instructions are sufficient to eradicate any potential prejudice in joint trials.

- 9 -

***Bruton***, 391 U.S. at 124-126. The United States Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when his non-testifying co-defendant's confession naming him as a participant in the crime is introduced at trial, even if the jury is instructed to consider that confession only against the co-defendant. ***Id.*** at 135-136.

Our supreme court has recently summarized ***Bruton*** and its progeny as follows:

> The general rule in a joint trial of co-defendants is that the law presumes that the jury can follow an appropriate instruction, which explains that evidence introduced with respect to only one defendant cannot be considered against other defendants. ***Bruton*** departed from this salutary general rule only by concluding that where there are "powerfully incriminating statements" admitted against a non-testifying co-defendant who stands side by side with the accused, such statements can be devastating as well as inherently suspect when they shift the blame to the accused. Following ***Bruton***, the U.S. Supreme Court has approved redaction and a limiting instruction as a means of eliminating the possible spillover prejudice arising from the admission of a non-testifying co-defendant's confession against that co-defendant at a joint trial. ***Bruton*** and its progeny establish Sixth Amendment norms governing state criminal trials, and this Court has had ample opportunity to consider and apply the precepts. In our own implementation of this federal law, we have explained that the challenged co-defendant's statement must be incriminating on its face and that redactions involving the substitution of neutral pronouns . . . instead of names or other obvious methods of deletion, do not obviously identify the other co-defendants.

*Commonwealth v. Daniels*, 104 A.3d 267, 294 (Pa. 2014) (citations omitted).

Applying these well-settled principles, we conclude that the statements in Jones' letter did not give rise to a *Bruton* violation because they did not explicitly reference or facially incriminate appellant in any way. As the trial court recognized in its opinion,

> [t]he letter was properly redacted with all references to [appellant] related to the shooting replaced by neutral phrases, such as "who" and "someone." . . . [B]ased on the evidence presented at trial, it was not automatic that [appellant] was the shooter referenced in Jones' letter, as the jury was free to believe [] Thomas shot Vessels.

Trial court opinion, 12/23/15 at 9-10.

Furthermore, the record reflects that the trial court provided two separate cautionary instructions to the jury emphasizing that they were prohibited from considering the contents of this letter against appellant. Specifically, the trial court instructed the jury as follows:

> Members of the jury, remember I told you some evidence can be admitted and you have to consider evidence in this case against one defendant and not the other defendant. Statements of co[-]conspirators can be admitted against each other when conspiracy is ongoing. But by the date of this letter, clearly there is no evidence that the conspiracy was still ongoing at that time. So this evidence is only admissible against Aki Jones, and I [will] talk about that when I give my final instruction.

Notes of testimony, 6/11/15 at 222.

> And I also just want to remind you there was some evidence during this trial that was specially admitted against Mr. Jones that was [sic] pertained to him and did not pertain to [appellant]. And I'm talking about that letter that was allegedly sent to Mr. [sic] Reid. Because, remember . . . statements of the co[-]conspirator during the course of the conspiracy can be admitted and are admitted against each of the co[-]conspirators. Once the conspiracy has ended, then that evidence can only, in any statement made by one co[-]conspirator, cannot be introduced because that conspiracy has ended. So if you were a previous conspirator, what you then say after it is over with does not pertain to the other person. So that's why I'm reminding you that the contents of that letter was [sic] introduced as evidence against Mr. Jones and not [appellant].

Notes of testimony, 6/15/15, at 36-37.

Courts in this Commonwealth have repeatedly recognized that "when examining the potential for undue prejudice, a cautionary jury instruction may ameliorate the prejudicial effect of the proffered evidence." **Commonwealth v. Hairston**, 84 A.3d 657, 666 (Pa. 2014), **cert. denied**, 135 S.Ct. 164 (2014) (citations omitted). Jurors are presumed to follow the trial court's instructions. **Commonwealth v. Elliott**, 80 A.3d 415, 445 (Pa. 2013), **cert. denied**, 135 S.Ct. 50 (2014). Accordingly, for all the foregoing reasons, we conclude that appellant's claim of trial court error must fail.

Appellant next argues that the trial court abused its discretion in allowing the Commonwealth to elicit testimony from Philadelphia Police Detective James Kopaczewski that referenced appellant's pre-arrest silence.

(Appellant's brief at 20.)   Specifically, Detective Kopaczewski testified as follows:

> [The Commonwealth:]  And did you ask him where he was on September 26, 2011?
>
> [Detective Kopaczewski:]  I did and he immediately -- just got up and that was it.
>
> THE COURT:   So that was the end of the interview?
>
> [Detective Kopaczewski]:  That's correct.

Notes of testimony, 6/11/15 at 87.  For the following reasons, we disagree.

"[T]he admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion."  ***Commonwealth v. Fransen***, 42 A.3d 1100, 1106 (Pa.Super. 2012), ***appeal denied***, 76 A.3d 538 (Pa. 2013) (citation omitted).  "An abuse of discretion is not merely an error of judgment; rather discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record."  ***Commonwealth v. Antidormi***, 84 A.3d 736, 745 (Pa.Super. 2014), ***appeal denied***, 95 A.3d 275 (Pa. 2014) (citation omitted).

Here, appellant avers that Detective Kopaczewski's testimony violated his right against self-incrimination guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution.  (Appellant's brief at 20-24.)   In support of this

claim, appellant relies, in large part, on this court's decision in *Commonwealth v. Molina*, 33 A.3d 51 (Pa.Super. 2011), *affirmed*, 104 A.3d 430 (Pa. 2014). In *Molina*, an *en banc* panel of this court held that "the Commonwealth cannot use a non-testifying defendant's pre-arrest silence to support its contention that the defendant is guilty of the crime charged as such use infringes on a defendant's right to be free from self-incrimination." *Molina*, 33 A.3d at 62 (citations omitted). The *Molina* court further noted that,

> [w]e find it of no moment whether the silence occurred before or after the arrest or before or after *Miranda* warnings were administered. **The Fifth Amendment was enacted to protect against self-incrimination, whether they are in custody or not, charged with a crime, or merely being questioned during the investigation of a crime.** We clarify that our finding does not impose a *prima facie* bar against any mention of a defendant's silence; rather, we guard against the exploitation of appellant's right to remain silent by the prosecution.

*Molina*, 33 A.3d at 63 (citation and footnote omitted).

Upon review, we conclude that appellant's reliance on *Molina* is misplaced. Unlike *Molina*, the record in this case indicates that the Commonwealth, via Detective Kopaczewski, did not offer evidence of appellant's pre-arrest silence as substantive evidence of his guilt. Rather, it is evident that the Commonwealth elicited said testimony for the narrow purpose of explaining the way his interview with appellant ended. Appellant also fails to cite to any place in the record wherein the Commonwealth

referenced appellant's decision to terminate the interview with Detective Kopaczewski as implicit evidence of his guilt. We find that our holding in **Commonwealth v. Adams**, 39 A.3d 310 (Pa.Super. 2012), **affirmed**, 104 A.3d 511 (Pa. 2014), is instructive. In **Adams**, a panel of this court concluded that a police officer's testimony that a defendant "had nothing to say" during his homicide investigation interview did not violate his Fifth Amendment right to remain silent. **Adams**, 39 A.3d at 319. The **Adams** court reasoned that this testimony "was offered for a narrow purpose, namely to demonstrate the nature and focus of the investigation," and "neither [the officer] nor the Commonwealth implied that [the defendant's] silence constituted a tacit admission of guilt." **Id.**

Moreover, we note that Detective Kopaczewski's reference to appellant's pre-arrest silence was brief in context. Our supreme court has recognized that "[e]ven an explicit reference to silence is not reversible error where it occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt[.]" **Commonwealth v. DiNicola**, 866 A.2d 329, 337 (Pa. 2005) (citation and parentheses omitted). Accordingly, we conclude that appellant's constitutional rights were not violated when Detective Kopaczewski testified.

Appellant next argues that the trial court violated his right to due process guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution

by permitting the Commonwealth to introduce a photograph of a revolver recovered from his cell phone, "where there was no proof that the gun depicted was the gun used to shoot [Vessels]." (Appellant's brief at 27.) Appellant maintains that the photograph in question was inadmissible under Pennsylvania Rule of Evidence 404(b)(1) and served only to demonstrate he has a criminal propensity to commit the crimes charged. (**Id.** at 28-31.) Appellant further posits he is entitled to a new trial because the prejudicial impact of this photograph outweighed its probative value. (**Id.**) We disagree.

"The threshold inquiry with admission of evidence is whether the evidence is relevant." **Commonwealth v. Cook**, 952 A.2d 594, 612 (Pa. 2008) (citations and bracket omitted). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." **Commonwealth v. Edwards**, 903 A.2d 1139, 1156 (Pa. 2006), **cert. denied**, 127 S.Ct. 2030 (2007) (citation and internal quotation marks omitted).

Generally, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Pa.R.E. 404(b)(1); **see also Commonwealth v. Weakley**, 972 A.2d 1182, 1189 (Pa.Super. 2009), **appeal denied**, 986 A.2d 150 (Pa. 2009) (stating, "[e]vidence of distinct crimes is not admissible against a

defendant being prosecuted for another crime **solely** to show his bad character and his propensity for committing criminal acts." (citation omitted; emphasis in original)). Evidence of prior bad acts may be admissible, however, "when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident." **Commonwealth v. Ross**, 57 A.3d 85, 98 (Pa.Super. 2012), **appeal denied**, 72 A.3d 603 (Pa. 2013) (citations omitted). "In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact." **Id.** (citation omitted).

Upon careful review, we discern no abuse of discretion on the part of the trial court in admitting the photograph of the revolver into evidence. Contrary to appellant's contention, we conclude that the photograph in question was relevant to establish that appellant had possession and control of a weapon similar to the one used to shoot Vessels. The evidence at trial established that the firearm depicted in the photograph was a silver revolver, the same type of gun used to shoot Vessels. (Notes of testimony, 6/9/15 at 78; **see also** Commonwealth's exhibit C-76A.) At trial, ATF Special Agent Bowman testified that the revolver depicted in the photograph that was recovered from appellant's cell phone was similar to the description of the gun used to shoot Vessels. (Notes of testimony, 6/11/15 at 69, 200-201.) Moreover, Philadelphia Police Officer Jesus Cruz,

an expert in the field of firearms identification and ballistics, testified that the bullet fragments recovered from the scene were consistent with ammunition capable of being fired from this type of revolver. (*Id.* at 42, 53-54.) Likewise, the probative value of this photograph, given the conceivable connection of said firearm to the instant crime, clearly outweighed its prejudicial impact. Accordingly, for all the foregoing reasons, we discern no abuse of discretion on the part of the trial court in allowing this photograph to be admitted into evidence.[4]

We now turn to appellant's claim that he was deprived of his right to a fair trial when the prosecutor "commented on the guilty verdicts of other juries in other cases" during his closing argument. (Appellant's brief at 31.) Specifically, appellant challenges the following comments made by the prosecutor during his summation:

> And you heard a little bit about reasonable doubt. It simply means it is not some impossible

---

[4] Generally, a weapon that "cannot be specifically linked to a crime" is inadmissible at trial. *Commonwealth v. Robinson*, 721 A.2d 344, 351 (Pa. 1998), *cert. denied*, 528 U.S. 1082 (2000). However, our supreme court has recently clarified this rule, stating as follows:

> [t]he only burden on the prosecution is to lay a foundation that would justify an inference by the finder of fact of the likelihood that the weapon was used in the commission of the crime. If a proper foundation is laid, the weapon is admissible where the circumstances raise an inference of the likelihood that it was used.

*Commonwealth v. Christine*, 125 A.3d 394, 400 (Pa. 2015) (citation and internal quotation marks omitted).

> standard. **It is the same standard upon which people are convicted of crimes in the city, the state, this country in every case.**

Trial court opinion, 12/23/15 at 15, quoting notes of testimony, 6/12/15 at 130 (emphasis added); **see also** appellant's brief at 31.

"Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." **Commonwealth v. Harris**, 884 A.2d 920, 927 (Pa.Super. 2005), **appeal denied**, 928 A.2d 1289 (Pa. 2007) (citations omitted). Not every unwise remark on a prosecutor's part, however, constitutes reversible error. **Id.** "Prosecutorial misconduct occurs when the effect of the prosecutor's comments would be to prejudice the trier of fact, forming in its mind fixed bias and hostility toward the defendant so that it could not weigh the evidence objectively and render a true verdict." **Commonwealth v. Duffy**, 832 A.2d 1132, 1137 (Pa.Super. 2003), **appeal denied**, 845 A.2d 816 (Pa. 2004).

> Counsels' remarks to the jury may contain fair deductions and legitimate inferences from the evidence presented during the testimony. The prosecutor may always argue to the jury that the evidence establishes the defendant's guilt, although a prosecutor may not offer his personal opinion as to the guilt of the accused either in argument or in testimony from the witness stand. Nor may he or she express a personal belief and opinion as to the truth or falsity of evidence of defendant's guilt, including the credibility of a witness.

**Commonwealth v. Chmiel**, 777 A.2d 459, 466 (Pa.Super. 2001), **appeal denied**, 788 A.2d 372 (Pa. 2001).

Following our careful review, we conclude that the prosecutor's comments, when read as a whole, did not warrant that a new trial be granted. "[A] prosecutor is permitted fairly wide latitude in advocating for the Commonwealth, including the right to argue all fair conclusions from the evidence, to respond to defense arguments, and to engage in a certain degree of oratorical flair." *Harris*, 884 A.2d at 931. All such comments must be reviewed in the context in which they were made. *Commonwealth v. Robinson*, 877 A.2d 433, 441 (Pa. 2005).

Here, the record reflects that the prosecutor's comments were made with a permissible degree of oratorical flair and were not the kind of comments that would cause the jury to form a fixed bias or hostility towards appellant and prevent it from properly weighing the evidence and rendering a fair and impartial verdict. Moreover, the jury was properly instructed during trial that it was the trial court's role to instruct the jury on the law, and that statements made by counsel do not constitute evidence. (*See* notes of testimony, 6/8/15 at 31-33; 6/15/15 at 22-27.) As noted, jurors are presumed to follow the trial court's instructions. *Elliott*, 80 A.3d at 445. Accordingly, appellant's claim that he is entitled to a new trial on account of the prosecutor's comments during closing arguments must fail.

In his final issue, appellant contends that his sentence of 20 to 40 years' imprisonment for attempted murder was illegal under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because "there was no specific finding

by the jury that [a]ppellant inflicted serious bodily injury [on Vessels.]" (Appellant's brief at 33.) We disagree.

"The determination as to whether the trial court imposed an illegal sentence is a question of law; our standard of review in cases dealing with questions of law is plenary." *Commonwealth v. Stradley*, 50 A.3d 769, 772 (Pa.Super. 2012) (citation omitted). The Pennsylvania Supreme Court summarized the holding in *Apprendi* as follows:

> In *Apprendi*, the United States Supreme Court held a New Jersey hate-crime statute unconstitutional because it permitted the imposition of a twenty[-]year sentence in place of the otherwise applicable ten year maximum if the judge determined, by a preponderance of the evidence, that the crime was perpetrated in violation of the statute. The United States Supreme Court determined that any facts, "other than the fact of a prior conviction," that subject a defendant to any additional penalty beyond a statutory maximum must be submitted to a jury and be found proved beyond a reasonable doubt.

*Commonwealth v. Gordon*, 942 A.2d 174, 175 n.1 (Pa. 2007), *cert. denied*, 553 U.S. 1024 (2008), citing *Apprendi*, 530 U.S. at 490.

The instant matter involves the application of Section 1102 of the Crimes Code, and, in particular, the "serious bodily injury" requirement. Read in relevant part, Section 1102 provides as follows:

> **(c) Attempt, solicitation and conspiracy.--** Notwithstanding section 1103(1) (relating to sentence of imprisonment for felony), a person who has been convicted of attempt, solicitation or conspiracy to commit murder, murder of an unborn child or murder of a law enforcement

> officer where serious bodily injury results may be sentenced to a term of imprisonment which shall be fixed by the court at not more than 40 years. Where serious bodily injury does not result, the person may be sentenced to a term of imprisonment which shall be fixed by the court at not more than 20 years.

18 Pa.C.S.A. § 1102(c).

"[T]he statute imposes a condition precedent to the imposition of a maximum term of imprisonment of up to 40 years, specifically, that 'serious bodily injury' must have resulted from the attempted murder. Otherwise, the sentence shall be not more than 20 years." ***Commonwealth v. Johnson***, 910 A.2d 60, 66 (Pa.Super. 2006), ***appeal denied***, 923 A.2d 1173 (Pa. 2007). Serious bodily injury is "a fact that must be proven before a maximum sentence of forty years may be imposed for attempted homicide." ***Commonwealth v. Reid***, 867 A.2d 1280, 1281 (Pa.Super. 2005), ***appeal denied***, 890 A.2d 1058 (Pa. 2005).

Here, the trial court reasons that appellant's judgment of sentence for attempted murder is proper because the jury was presented with ample evidence to determine that appellant inflicted "serious bodily injury" upon Vessels. (***See*** trial court opinion, 12/23/15 at 17.) Upon review, we agree with the trial court's conclusions. "Serious bodily injury" is defined in the Crimes Code as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of a bodily member or organ." 18 Pa.C.S.A.

§ 2301. The evidence at trial established that appellant shot Vessels five times, including once in the neck, once in the back, and once in the stomach. (Notes of testimony, 6/9/15 at 66-67, 70-74.) Vessels testified that he lost the use of his left hand and left side of his body as a result of the shooting, and suffered nerve damage that causes him to twitch. (*Id.* at 68.)

We further point out that the jury in fact determined beyond a reasonable doubt that serious bodily injury occurred when it found appellant guilty of aggravated assault in violation of 18 Pa.C.S.A. § 2702(a)(1).[5] In this case, the jury instructions were fashioned so that the jury could only convict appellant of aggravated assault if it found beyond a reasonable doubt that he intentionally caused serious bodily injury to Vessels. Specifically, the trial court instructed the jury as follows:

> Aggravated assault causing serious bodily injury. Both [appellant and Jones] have been charged with aggravated assault. To find either of these defendants guilty of this offense, you must find the elements have been proven beyond a reasonable doubt: First, that the defendant [a]s coconspirator or his accomplice caused serious bodily injury to [] Vessels. Serious bodily injury is bodily injury that causes a substantial risk of death or that causes serious permanent disfigurement or protracted loss or impairment of the functions of any bodily member or organ. And second, that the defendant acted intentionally, knowingly or recklessly under

---

[5] Section 2702(a)(1) provides that "[a] person is guilty of aggravated assault if he . . . attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]"

> circumstances manifesting extreme indifference to the value of human life.

Notes of testimony, 6/15/15 at 55-56. As noted, the jury is presumed to follow the trial court's instructions with regard to the applicable law. *Elliott*, 80 A.3d at 445. Accordingly, in determining that appellant was guilty of aggravated assault, the jury in fact concluded that appellant inflicted serious bodily injury upon Vessels.

Appellant relies, in large part, on this court's decision in *Johnson* to support his assertion that the jury had to be specifically instructed on "serious bodily injury" for the attempted murder charge. (*See* appellant's brief at 34-35.) The facts of *Johnson*, however, are distinguishable from the case *sub judice*.

In *Johnson*, this court concluded that the jury did not find serious bodily injury for the purposes of applying the maximum for attempted murder, even though the appellant had been convicted of aggravated assault. *Johnson*, 910 A.2d at 67-68. However, unlike the instant matter, there was no evidence in *Johnson* that the jury convicted the appellant of aggravated assault on the basis that serious bodily injury actually occurred. Rather, the evidence in *Johnson* established that the appellant fired multiple gunshots at the victim, but only struck her once in the heel of her foot. *Id.* at 62. Thus, the jury in *Johnson* could have convicted the appellant of aggravated assault based merely on an attempt to commit

serious bodily injury.  As such, ***Johnson*** is clearly distinguishable from the case at hand.

In light of the foregoing, we conclude that the trial court did not error in imposing a sentence of 20 to 40 years' imprisonment for the attempted murder conviction.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/16/2016