J-S37041-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TYREE JACKSON | : | |
| | : | |
| Appellant | : | No. 418 EDA 2021 |

Appeal from the PCRA Order Entered January 25, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0007006-2012

BEFORE: PANELLA, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED JANUARY 19, 2022**

Appellant, Tyree Jackson, appeals from the January 25, 2021, order entered in the Court of Common Pleas of Philadelphia County, which dismissed Appellant's first petition filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546, without an evidentiary hearing. After a careful review, we affirm.

The relevant facts and procedural history are as follows: Appellant was arrested in connection with the armed robbery and shooting of Luther Wilkinson ("Mr. Wilkinson" or "Wilkinson"), and represented by counsel, he

---

[*] Former Justice specially assigned to the Superior Court.

proceeded to a jury trial.[1]  The trial court has aptly summarized the evidence

offered at Appellant's jury trial as follows:

[Wilkinson] testified at trial that Appellant's co-defendant, Tyrik Lark ("Lark"), called him [at] around 9:00 p.m. on January 23, 2012, while Wilkinson was inside [of] his second-floor residence that he rented at *** North 27th Street, in [Philadelphia].  Wilkinson had known Lark [for] about ten years and previously loaned him money.  On this occasion, Lark sought to borrow $50.00, and Wilkinson agreed to extend him another loan.  About fifteen minutes after his initial phone call, Lark again called Wilkinson to advise he was standing outside [of] Wilkinson's front door.  Wilkinson retrieved $50.00 from a money pouch inside [of] his room and descended the steps to the front door.  Wearing only "long johns," Wilkinson had no intention of inviting Lark inside and only "wanted to give him the money and go back upstairs." (N.T., 6/24/15, pgs. 9-14).

When Wilkinson opened the door and handed Lark the money, Lark "push[ed] himself in," grabbed Wilkinson's arms, and pushed him upstairs to his room.  Appellant followed behind.  Once inside [of] the room, Lark confiscated Wilkinson's money pouch that contained at least $100.00, struck Wilkinson twice on the head, and "ripped" a chain from Wilkinson's neck that contained "a lion pendant with a ruby in the mouth of it."  In the meantime, Appellant blocked the door to Wilkinson's room and pointed a gun at Wilkinson. (N.T., 6/24/15, pgs. 15-22).[2]

2 Wilkinson was 66 years old at the time of the incident described herein. (N.T., 6/24/15, pgs. 8-9).  Lark was 29 years old, and Appellant was approximately 32 years old. (N.T., 6/23/15, pgs. 4-5).  In other words, the senior victim was over twice the age of each of his two intruders, one of whom pointed a loaded gun at the 66-year-old man while the other beat and robbed him.

After beating and robbing Wilkinson, Lark instructed [Appellant] to "get rid" of him because he knew Lark's identity.  Appellant accordingly fired his gun and shot Wilkinson in his right buttocks, whereupon Lark grabbed Wilkinson's cellphone off a bed and fled the premises. Appellant then pointed his gun directly at Wilkinson's head and pulled the trigger several more times, but

---

1 Appellant was tried jointly with his co-defendant, Tyrik Lark, and the jury convicted Lark of robbery and burglary.

the gun failed to discharge[,] and Appellant soon fled downstairs behind Lark. (N.T., 6/24/15, pgs. 24-28).

Luckily still alive, Wilkinson…went downstairs to where his landlord, "Booni," resided, and [he] asked Booni to call an ambulance.[3] Emergency responders and police subsequently arrived[,] and Wilkinson was transported to Temple University Hospital.[4]

---

3 Booni, whose real name is Paul Cothran, also testified at trial. Booni owned the residence at *** North 27th Street and rented a second-floor room to Wilkinson, who Booni knew as "Jamaica" because of his Jamaican accent. On the evening of January 23, 2012, Booni heard a gunshot and saw two people running from the premises. Booni thereafter heard Wilkinson calling for him, went upstairs, and learned that Wilkinson had been shot. Boonie testified that he had known Lark since Lark "was a kid," and that, although Boonie did not see the faces of the two individuals running from his premises, he would have noticed if Lark had been one of them. (N.T., 6/24/15, pgs. 180-84).

4 The parties stipulated that "on January 23rd of 2012, Mr. Wilkinson was admitted at Temple University at 11:14 p.m. He was treated for a single gunshot wound to the right buttocks and then released on January 24, 2012, the very next day, at 4:21 a.m." (N.T., 6/24/15, pg. 198).

---

Upon his discharge several hours later, Wilkinson was taken directly to police headquarters where he gave a statement and identified Lark via photograph. (N.T., 6/24/15, pgs. 27-31). At that time, Wilkinson did not yet know Appellant's name. (*Id.* pgs. 32-35).

The Commonwealth also presented the testimony of several Philadelphia police officers. Detective Brian Newell testified that he took statements from Wilkinson within hours of the shooting and that Wilkinson identified Lark in a photograph at police headquarters. Detective Newell and fellow officers subsequently executed search and arrest warrants at Lark's home on January 24, 2012, during which they arrested Lark and searched his cellphone. Lark's cellphone data verified that Lark had called Wilkinson twice on January 23, 2012,--once at 9:21 p.m. and again at 9:33 p.m. (N.T., 6/24/15, pgs. 123-38).

Detective Edward Keppel testified that Wilkinson contacted him several days after the shooting to advise he had learned Appellant's name was Tyree. Detective Keppel's investigation soon revealed that Appellant's last name was Jackson, and upon presenting Wilkinson a photo array on February 1, 2012, Wilkinson promptly identified Appellant as the individual who shot

him. Detective Keppel and fellow officers then executed search and arrest warrants at a residence associated with Appellant, but Appellant was not present. (N.T., 6/24/15, pgs. 155-64, 169).[5]

---

5 Detective Keppel additionally testified that, while officers assisted Wilkinson "mov[e] out of his room" because he was "afraid" to remain in the residence where he was shot, Wilkinson directed the detective to a ".380 caliber fired cartridge case" that Wilkinson found inside the premises. (*Id.* pg. 164).

---

Officer Gregory Wallace testified that between February and April of 2012, he had surveilled several locations where Appellant was known to congregate. On April 13, 2012, Officer Wallace and his fellow officers discovered Appellant inside a vehicle at one such location and placed him under arrest. Although Appellant initially provided Officer Wallace [with] a false name, he eventually disclosed his real name and stated, "You're lucky you got me now because I was outta here tomorrow. I was going back to Seattle." (N.T., 6/24/15, pgs. 187-93).

Detective William Urban testified that he was a "lineup supervisor" at the Philadelphia police department, and that he coordinated a lineup in which Wilkinson identified Appellant as the person who shot him. According to Detective Urban, Wilkinson identified Appellant without any hesitation. (N.T., 6/24/15, pgs. 104-10).

At the conclusion of the testimony and closing arguments, the jury found Appellant guilty of aggravated assault, robbery, burglary, unlawfully carrying a firearm, and possessing an instrument of crime, but not guilty of attempted murder and conspiracy to commit murder. The jury found Lark guilty of robbery and burglary but not guilty of attempted murder, conspiracy, aggravated assault, and possessing an instrument of a crime. (N.T., 6/25/15, pgs. 52-56).

\*\*\*

On October 26, 2015, the trial court sentenced Appellant to 10 to 20 years' incarceration for his conviction of aggravated assault, a consecutive term of 4 to 10 years' incarceration for this conviction of robbery, and a concurrent term of 4 to 10 years' incarceration for his conviction of burglary.

On October 29, 2015, Appellant filed a motion for reconsideration/reduction of sentence, which the trial court denied on February 24, 2016. On March 14, 2016, Appellant filed a notice of appeal to the Superior Court. On April 11, 2016, Appellant's

court-appointed counsel filed a statement of intent to file an Anders/McClendon brief pursuant to Pa.R.A.P. 1925(c)(4).

Trial Court Opinion, filed 8/2/16, at 1-5 (footnotes omitted) (footnotes in original).

While Appellant's direct appeal was pending before this Court, Appellant filed a *pro se* PCRA petition on April 29, 2016. The docket contains no entry that this petition was forwarded to Appellant's counsel.

Meanwhile, on November 8, 2017, this Court affirmed Appellant's judgment of sentence.[2] Appellant did not file a petition for allowance of appeal without our Supreme Court.

Apparently having held Appellant's *pro se* PCRA petition in abeyance, on March 18, 2019, the PCRA appointed new counsel to assist Appellant with his PCRA petition. Following the grant of numerous continuances, on September 9, 2019, counsel filed an amended PCRA petition, and on August 20, 2020, he filed a supplemental PCRA petition. The Commonwealth filed motions in opposition to both filings.

On November 24, 2020, the PCRA court provided Appellant with notice of its intent to dismiss Appellant's PCRA petition under Pa.R.Crim.P. 907 without an evidentiary hearing. By order entered on January 25, 2021, the PCRA court dismissed Appellant's PCRA petition, and this counseled appeal

_____

[2] On appeal, Appellant argued the mandatory minimum sentence imposed by the trial court was illegal. We found no merit to his claim.

followed on February 24, 2021. All Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant sets forth the following issues in his "Statement of the Questions Involved" (verbatim):

1. Did the PCRA Court err and/or abuse its discretion when it denied appellant/defendant's petition under the PCRA seeking relief based upon a claim that trial counsel was ineffective for failing to object when trial counsel for appellant's co-defendant asked a question which elicited inculpatory hearsay testimony which would have been otherwise inadmissible, and where counsel failed to request a limiting jury instruction even if that evidence was properly admitted?

2. Did the PCRA Court err and/or abuse its discretion when it denied appellant/defendant's petition under the PCRA seeking relief based upon a claim that trial counsel was ineffective for asking questions which elicited inculpatory hearsay testimony which would have been otherwise inadmissible, and where counsel failed to request a limiting jury instruction even if that evidence was properly admitted

Appellant's Brief at 4 (suggested answers and footnotes omitted).

Our standard and scope of review is as follows:

When reviewing the propriety of an order pertaining to PCRA relief, we consider the record in the light most favorable to the prevailing party at the PCRA level. This Court is limited to determining whether the evidence of record supports the conclusions of the PCRA court and whether the ruling is free of legal error. We grant great deference to the PCRA court's findings that are supported in the record and will not disturb them unless they have no support in the certified record. However, we afford no such deference to the post-conviction court's legal conclusions. We thus apply a *de novo* standard of review to the PCRA [c]ourt's legal conclusions.

*Commonwealth v. Diaz*, 183 A.3d 417, 421 (Pa.Super. 2018) (internal citations and quotation marks omitted).

Initially, we note this appeal presents a problematic procedural posture in that Appellant's *pro se* PCRA petition was filed on April 29, 2016, while Appellant's direct appeal was pending before this Court and Appellant was represented by counsel. Thus, Appellant's *pro se* petition was filed prematurely; that is, before his judgment of sentence became final. 42 Pa.C.S.A. § 9545(b)(1) (indicating a PCRA petition "shall be filed within one year of the date the judgment becomes final"); 42 Pa.C.S.A. § 9545(b)(3) (indicating "judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review."). Moreover, his *pro se* petition violated the prohibition against hybrid representation. **See Commonwealth v. Mojica**, 242 A.3d 949 (Pa.Super. 2020).

Accordingly, "we note that the PCRA court was mistaken in treating Appellant's *pro se* PCRA petition as a valid pleading under Pennsylvania law and would ordinarily call for this Court to vacate the order adjudicating [the PCRA] claims." **Id.** at 953 (citing **Commonwealth v. Willis**, 29 A.3d 393, 400 (Pa.Super. 2011) (vacating order entered on PCRA petition that violated hybrid representation); **Commonwealth v. Leslie**, 757 A.2d 984, 985 (Pa.Super. 2000) (vacating order entered on prematurely filed PCRA petition)). The PCRA court should have dismissed the *pro se* PCRA petition without prejudice to Appellant's ability to re-file it when his judgment of

sentence became final or otherwise treated it as a legal nullity. ***See Mojica***, ***supra***.

Moreover, we note that Pa.R.Crim.P. 576(A)(4) required that a time-stamped copy of Appellant's *pro se* PCRA petition be forwarded to both Appellant's counsel and the Commonwealth within ten days of receipt.[3] However, the docket and certified record provided to us in the instant case is silent as to whether this service ever occurred.

Recently, this Court addressed an appeal with a procedural posture similar to the one at bar. Specifically, in ***Mojica***, ***supra***, the appellant filed a premature PCRA petition *pro se*; the clerk of courts failed to forward the *pro se* petition to the parties; the lower court held the petition in abeyance; and after the appellant's judgment of sentence became final, the lower court permitted counsel to file an amended PCRA petition.[4]

In analyzing the procedural matter in ***Mojica***, this Court relevantly held:

> The [procedural] issues are not merely formalistic. As with all PCRA petitions, [the] [a]ppellant must satisfy the jurisdictional requirements underlying the PCRA, which includes timeliness. Specifically, all PCRA petitions must be filed "within one year of the date that the judgment becomes final[.]"

---

[3] Pa.R.Crim.P. 576(A)(4) requires the clerk of courts to accept and docket *pro se* filings; however, the commentary to the rule suggests such action is taken only to provide a record of the filing and does not trigger any deadline nor require any response. Pa.R.Crim.P. 576, at cmt.

[4] As in the case *sub judice*, the counseled amended petition in ***Mojica*** was filed after the time for the appellant to technically file a timely PCRA petition. ***Mojica***, 242 A.3d at 954.

In the intervening [years] following [the] [a]ppellant's *pro se* filing, his sentence became final and his window in which to file a valid PCRA petition expired. ***See*** 42 Pa.C.S.A. § 9545(b)(1). Due to the PCRA court's misapprehension concerning the validity of [the] [a]ppellant's *pro se* petition and the violation of Rule 576(A)(4), [the] [a]ppellant's amended petition was not actually filed until it was technically untimely under the PCRA.

While acknowledging the significant procedural issues posed by [the] [a]ppellant's initial *pro se* petition, we emphasize that these faults are directly attributable to the PCRA court's error. This misstep was further exacerbated by the failure of the clerk of courts to provide a copy of this *pro se* filing to the parties pursuant to Rule 576(A)(4). Under these circumstances, we conclude that it would be unjust to consider [the] [a]ppellant's *pro se* petition as a legal nullity.

Furthermore, "[o]nce counsel has been appointed for an indigent petitioner, the rules of criminal procedure further contemplate after reviewing the certified record appointed counsel may…elect to raise additional issues beyond those which the petitioner raised in the initial *pro se* filing." ***Commonwealth v. Padden***, 783 A.2d 299, 308 (Pa.Super. 2001). Thus, PCRA courts are invested with great discretion to permit the amendment of a post-conviction petition. ***See*** Pa.R.Crim.P. 905(a) ("The judge may grant leave to amend or withdraw a petition for post-conviction collateral relief at any time. Amendment shall be freely allowed to achieve substantial justice.").

Under these circumstances, we will deem that the numerous entries of appearances and PCRA filing extensions entered by the PCRA court…properly extended [the] [a]ppellant's time in which to file an amended petition. ***See*** Pa.R.Crim.P. 905(a); ***see also Commonwealth v. Boyd***, 835 A.2d 812, 816 (Pa.Super. 2003)[.] As such, we will address the merits of this appeal.

***Mojica***, 242 A.3d at 954-55 (citations and footnotes omitted).

As in ***Mojica***, we conclude there were breakdowns in the PCRA court as it related to Appellant's *pro se* PCRA petition such that it would be unjust to consider Appellant's *pro se* PCRA petition a legal nullity. Specifically, the PCRA court held Appellant's prematurely filed *pro se* PCRA petition in abeyance, and

the clerk of courts failed to forward the *pro se* document to defense counsel. Further, after this Court affirmed Appellant's judgment of sentence, the PCRA court appointed new counsel to assist Appellant, granted various extensions of time, and effectively permitted Appellant to file a counseled amended PCRA petition, as well as a supplemental PCRA petition. As such, we find **Mojica** to be on point, and we shall proceed to examine the merits of Appellant's appeal.

Appellant's claims present allegations of ineffective assistance of trial counsel. Accordingly, we apply the following well-established legal principles:

> In order to be eligible for PCRA relief, the petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found in Section 9543(a)(2), which includes the ineffective assistance of counsel. 42 Pa.C.S.[A.] § 9543(a)(2)(i).

> It is well-established that counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him. To prevail on an ineffectiveness claim, the petitioner has the burden to prove that (1) the underlying substantive claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance. The failure to satisfy any one of the prongs will cause the entire claim to fail.

**Commonwealth v. Benner**, 147 A.3d 915, 919–20 (Pa.Super. 2016) (quotation marks, quotations, and citations omitted).

> We need not analyze the prongs of an ineffectiveness claim in any particular order. Rather, we may discuss first any prong that an appellant cannot satisfy under the prevailing law and the applicable facts and circumstances of the case. [C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.

- 10 -

*Commonwealth v. Johnson*, 635 Pa. 665, 139 A.3d 1257, 1272 (2016) (citations omitted). *See Commonwealth v. Daniels*, 600 Pa. 1, 963 A.2d 409, 419 (2009) ("A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.") (citation omitted)). "A claim has arguable merit where the factual averments, if accurate, could establish cause for relief." *Commonwealth v. Stewart*, 84 A.3d 701, 707 (Pa.Super. 2013) (*en banc*) (citation omitted).

Further,

> To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. [A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.

*Commonwealth v. Spotz*, 624 Pa. 4, 84 A.3d 294, 311-12 (2014) (citations, quotation marks, and quotations omitted).

In his first issue, Appellant contends trial counsel was ineffective in failing to object and/or seek a curative instruction when Appellant's co-defendant's counsel, Paul Michael DiMaio, Esquire, asked a question, which elicited inculpatory inadmissible hearsay testimony. Specifically, Appellant contends Attorney DiMaio improperly cross-examined Wilkinson about a "somebody" who told him that a man named "Tyree" was the second robber.

Appellant contends that Wilkinson's testimony "relating to the fact that 'somebody' told Wilkinson that 'Tyree'-*i.e.*, [Appellant]-was the second man involved in the robbery" was inadmissible hearsay, and therefore, his trial

- 11 -

counsel should have objected and/or requested a curative instruction. ***See*** Appellant's Brief at 33. He further contends "the only evidence…linking [Appellant] to these crimes is the identification by Wilkinson….His identification of [Appellant] is…strained as he concedes that he does not know [Appellant], and he did not identify him until after someone else told him that [Appellant] was one of the culprits." Appellant's Brief at 33-34. Accordingly, he contends he was prejudiced by counsel's omission.

In rejecting Appellant's ineffective assistance of counsel claim, the PCRA court relevantly indicated the following:

> At trial, counsel for co-defendant Lark (Mr. DiMaio) cross-examined the victim, Mr. Wilkinson, about his identifications of Appellant. Mr. Wilkinson had testified on direct examination that, while he knew Mr. [Lark] personally on the date of the robbery, he did not know the identity of the other male with Mr. [Lark]. (N.T., 6/24/15, p. 31-33). He said that he told the police on that day that he was unable to identify the second male.
>
> **[Assistant District Attorney]:** So, you sign that photograph [referring to Mr. Lark]. You say this is Tyrik Lark. Okay.
>
> What about [Appellant], did you know [Appellant's] name that day?
>
> **MR. WILKINSON:** No, sir.
>
> **Q:** At any point, sir, did you find out his name?
>
> **A:** Yes. Somebody told me.
>
> **[Appellant's trial counsel]:** Objection.
>
> **THE COURT:** Overruled.
>
> **Q:** You get this information. Sir, do you tell the police this information?
>
> **A:** Yes, sir.
>
> **Q:** When you tell the police, what do you tell them about [Appellant]?

- 12 -

**A:** I told them that somebody told me that—

**THE COURT:** Okay. That's sustained. [ADA], come on.

**Q:** Understood, Your Honor. So, you tell them that information?

**A:** Yes, sir.

(N.T., 6/24/15, pgs. 32-33).

Mr. Wilkinson went on to testify that he subsequently told police the name that "somebody" told him, and he then identified Appellant's photograph [from an array] as the person who shot him. (N.T., 6/24/15, pgs. 33-34). Mr. Wilkinson identified Appellant as the shooter again at a subsequent lineup. (N.T., 6/24/15, pgs. 34-35). Mr. Wilkinson identified Appellant as the shooter again at the preliminary hearing and then at trial. (N.T., 6/24/15, pgs. 35, 14).

On cross-examination, co-defendant's counsel, Mr. DiMaio, inquired further as to this third party.

**MR. DIMAIO:** So, the next question was, Can you describe the other male? The answer: Black male, dark shirt, wearing a black coat. I don't know him. 20s. Does that sound right?

**MR. WILKINSON:** I didn't know him.

**Q.** So you didn't know him, and you didn't know his name; is that correct?

**A.** No. I didn't know his name.

**Q.** So at what point did you hear that it might be a man by the name of Tyree?

**A.** Somebody told me that.

**Q.** When was this? I'm not asking who or how it was said to you. I'm asking how long after you gave this statement was it told to you?

**A.** I think a couple of days.

**Q.** Couple of days?

**A.** Two days.

**Q.** So was it before your second statement that you met with the detectives? You remember giving a

- 13 -

second statement about a week or so later, correct, to the police? You met with them again?

**A.** It's before.

**Q.** After this statement but before the second statement?

**A.** Yes, sir.

N.T., 6/24/15, at 41-42.

Appellant asserts that [his] trial counsel, Mr. Seay, was ineffective for failing to object [to] this testimony on cross-examination by [Appellant's co-defendant's] counsel, Mr. DiMaio.

\*\*\*

"The admission of evidence is a matter committed to the sound discretion of the trial court, and the court's evidentiary decision will not be overturned absent an abuse of that discretion." ***Commonwealth v. Edwards***, 588 Pa. 151, [903 A.2d 1139, 1156] (2006) (citations omitted). Hearsay is an out-of-court statement of a "declarant" that "a party offers in evidence to prove the truth of the matter asserted in the statement." ***See*** Pa.R.E. 801. Hearsay "is admissible at trial unless it falls into one of the exceptions to the hearsay rule." ***Commonwealth v. Charlton***, 902 A.2d 554, 559 (Pa.Super. 2006). "Hearsay evidence is presumed to be unreliable because the original declarant is not before the trier of fact, and therefore, cannot be challenged as to the accuracy of the information conveyed." ***Commonwealth v. Fransen***, 42 A.3d 1100, 1112 (Pa.Super. 2012) [(*en banc*) (citation omitted)]. "Exceptions to the hearsay rule are premised on circumstances surrounding the utterance which enhances the reliability of the contents of the utterance, and render unnecessary the normal judicial assurances of cross-examination and oath." ***Id.***

….[I]t is well-established that an out-of-court statement offered not for its truth, but to explain the witness's course of conduct, is not hearsay. ***Commonwealth v. Johnson***, 615 Pa. 354, 42 A.3d 1017, 1035 (2012).

Out-of-court statements offered to explain a course of conduct is not uncommon when a party is attempting to show why there was a lapse in time in a police investigation, or how and when a particular individual was identified as a perpetrator. [Our Supreme Court has held that an] officer's testimony [explaining] why he continued an investigation based upon his conversation

- 14 -

with a third party was offered not for the truth of what the third party told him, but to explain the course of his investigation. ***Commonwealth v. Rega***, [593 Pa. 659], 933 A.2d 997, 1017 (2007)…."[I]t is a longstanding rule of jurisprudence that an out-of-court statement offered to explain a course of conduct is not hearsay." ***Commonwealth v. Dargan***, 897 A.2d 496, [500] (Pa.Super. 2006) [(quotation marks and quotations omitted)].

Here, Mr. Wilkinson was asked by the prosecutor about the timing of his initial identification of Appellant, which happened almost a week after the robbery. [Appellant's trial counsel objected to the initial question, and the trial court overruled the objection.] [Mr. Wilkinson then] explained why he returned to the police and when he learned of Appellant's name. The fact that he learned of Appellant's name through a third party [was not offered for the truth of the matter asserted]. Because this testimony only elaborated on how he identified Appellant to the police, it was admissible to explain his course of conduct during the investigation.

Thereafter, on cross-examination, [Appellant's co-defendant's] counsel was attempting to get the witness to commit to the point in time when he either knew or didn't know of Appellant's identity, and he specifically instructed the witness not to tell him who may have given him Appellant's name or how it was said to him. Clearly, this line of questioning [on cross-examination] was relevant to explain why the witness waited for close to a week after the robbery to identify Appellant. Appellant's counsel had already objected to this line of questioning on direct examination, and although his objection to the mere explanation of learning Appellant's name through a third party was initially overruled, [the trial court] sustained when Mr. Wilkinson was about to repeat the third party's actual statement. (N.T., 6/24/15, pgs. 33-34). The cross-examination questions posed by [Appellant's co-defendant's] counsel stayed within the same parameters; namely, an explanation of the timing of Mr. Wilkinson's eventual identification of Appellant as the shooter.

Inasmuch as Appellant's trial counsel would have had no basis for lodging an objection at the aforesaid point in cross-examination by [Appellant's co-defendant's] counsel, he cannot be found ineffective for failing to do so.

Further, trial counsel was not ineffective for failing to request a limiting jury instruction concerning Mr. Wilkinson's mention of a "somebody" who told him Appellant's name.

- 15 -

The trial court held a charging conference wherein Appellant's counsel made a request for a **Kloiber**[5] charge, "based on [his] client's request to make the **Kloiber** charge," indicating that although counsel did not believe the charge was appropriate, he was protecting the record for his client. (N.T., 6/25/15, pgs. 7-8). The court disagreed with the request, however, [it] did give the [standard] jury instruction concerning identification testimony/accuracy in doubt. The jury was instructed to consider the details surrounding Mr. Wilkinson's identification of Appellant, including whether he had a good opportunity to observe the perpetrators of the offense; whether he'd made any prior identifications of the defendants as the perpetrators; whether his identification was positive or rather was it qualified by inconsistency; and whether he'd identified anybody else as one of the perpetrators. Furthermore, the jury was instructed that they should consider "all of the evidence relative to the question of who committed this crime, including the testimony of any witnesses from which identity or nonidentity of the perpetrator of this crime may be inferred." (N.T., 6/25/15, pgs. 24-25).

The…aforesaid jury instruction accurately and clearly presented the law to the jury and was sufficient to guide the jury in its deliberations. The jury, therefore, was properly instructed on how to receive Mr. Wilkinson's identification of Appellant.

However, even if [Appellant's trial] counsel had requested a limiting instruction concerning this "somebody" who gave Appellant's name to Mr. Wilkinson, it would have been within the [trial] court's discretion to do so. Appellant cannot show that he was prejudiced in any way, or that the outcome of the trial would have been different but for the lack of a limiting instruction.

\*\*\*

Here, [Appellant was not prejudiced] in the admission of the testimony or the failure to request a limiting jury instruction…insofar as [Wilkinson] made multiple identifications of Appellant to the police and in court, notwithstanding his

---

[5] **Commonwealth v. Kloiber**, 378 Pa. 412, 106 A.2d 820 (1954).

identification of Appellant's photograph.[6]  It would defy logic to believe that Appellant's conviction hinged on [Wilkinson's] statement that "somebody" told him Appellant's name.  Appellant is unable to show that he was prejudiced by counsel's actions in any way; he certainly cannot show that an additional objection here would have resulted in any different outcome.

PCRA Court Opinion, filed 5/13/21, at 6-13 (citations and footnote omitted) (footnotes added).

We agree with the PCRA court's sound reasoning.  Specifically, we agree there is no arguable merit to Appellant's underlying claim, and thus, his ineffectiveness claim fails on this basis.  **Johnson**, **supra**.  Further, we agree with the PCRA court that Appellant has failed to demonstrate that he was prejudiced by counsel's omission.  **See Spotz**, **supra**.

The record reveals Wilkinson had a full view of Appellant, who attempted to shoot him in the head.  The victim positively identified Appellant as one of the robbers in a photo array, a prison lineup, and in court.  Appellant has failed to demonstrate that the fact "someone" told Wilkinson a man named "Tyree" was one of the shooters does not establish a reasonable probability that, but for counsel's omission, the result of the proceedings would have been

---

[6] We note there is no dispute, and Appellant admits, that after Wilkinson informed the police that "someone" told him the second robber's name was "Tyree," "Detective Keppel identified [Appellant] as this 'Tyree' and placed his photo in an array with several other individuals.  Wilkinson then identified [Appellant's] photo and subsequently identified him at a lineup after being shown this photo by police."  Appellant's Brief at 44.

different. ***Spotz***, ***supra***. Accordingly, Appellant is not entitled to relief on his first claim.

In his next issue, Appellant contends trial counsel was ineffective for asking questions, which elicited inculpatory inadmissible hearsay testimony, and to the extent the evidence was admissible, for failing to request a limiting jury instruction. Specifically, Appellant contends his trial counsel improperly elicited testimony on the cross-examination of Wilkinson regarding "somebody" telling Wilkinson that Appellant was one of the men involved in the robbery. ***See*** Appellant's Brief at 47. He further contends that, after trial counsel elicited the testimony, he should have requested "a limiting jury instruction regarding the jury's permissible use(s) of the testimony relating to the fact that 'somebody' told Wilkinson that 'Tyree'-*i.e.*, [Appellant]-was the second man involved in the robbery." ***Id.***

In rejecting Appellant's ineffective assistance of counsel claim, the PCRA court relevantly indicated the following:

> Appellant's trial counsel (Mr. Seay) also cross-examined Mr. Wilkinson extensively about each interaction he had with [the] police subsequent to the robbery. As set forth herein, the timing of his initial identification of Appellant to police was at issue. In attempting to get the witness to commit to the timing of when he identified Appellant, the witness instead offered that he talked to detectives either two or three times. Again, trying to get the witness to be specific in his responses, trial counsel had the following [exchange] with [Wilkinson during cross-examination]:
>
> **MR. SEAY:** Do you recall speaking to Detective Keppel and providing him with a name Tyree?
>
> **MR. WILKINSON:** Yes, sir.

**Q:** When you spoke to the detective that day, he had you come in the next day to make an identification of a photograph, correct?

**A:** No. The same night when I talked to [the] detective, I was looking at the computer. He show[ed] me the computer. He said, Look if you see the man who rob[bed] you and g[ave] the order to kill you.

**Q:** Okay.

**A:** When I was looking at it, I saw the picture of Tyrik[,] and I said, This is the man.

**THE COURT:** You saw the picture of who? Mr. Lark or [Appellant]?

**A:** Mr. Lark.

**MR. SEAY:** Then there came another time that you made an identification that you said was [Appellant], correct?

**A:** [Appellant] do what?

**Q:** I'm asking you, sir, if you ever made an identification of a photograph of [Appellant]?

**A:** (Nodding)

**Q:** That's a yes?

**A:** Yes. When I go to the prison to point—when I go to the prison to point him out.

(N.T., 6/24/15, pgs. 73-74).

Trial counsel then directed the witness' attention to the photograph rather than the line-up. He showed the witness the photograph of Appellant that the witness signed on February 1, 2012, and the witness agreed that he did not sign the photograph on that date. Thereupon, trial counsel had the following exchange with the witness:

**MR. SEAY:** Okay. And that's when you were in the police district with the detectives, correct?

**MR. WILKINSON:** Yes, sir.

**Q:** But the day before that, you spoke to police officers—I'm sorry—to detectives, and gave them a name, Tyree. Do you remember doing that?

**A:** The day before?

**Q:** Yes, sir.

**A:** The time when I talked to the detective is when this person t[old] me that the guy who shot me, his name was Tyree. But when I see the picture, I know it was him who shot me.

**Q:** So, the answer to my question is, you spoke to the detective the day before. Before you signed that, you spoke to the detectives, right?

**A:** When I see the picture.

**Q:** Who was the person that told you it was Tyree?

**A:** It's a man [that] tells me that.

**THE COURT:** Answer the question. Who told you?

**A:** Who told me that? It's a man [that] told me that.

**Q:** What's the man's name?

**A:** It's a man that sells things on the road [that] tell[s] me that.

**Q:** What's the man's name?

**A:** I can't remember hi[s] name right now.

**Q:** Did you ever tell the detectives the man's name?

**A:** No. I didn't remember his name.

**Q:** When you talked to the detectives that day and said that it was—somebody told you Tyree, you didn't know his name that day?

**A:** No. I told him that—

**[ADA]:** Objection, asked and answered.

**THE COURT:** Overruled.

**A:** I told him that Tyree is the one who g[ave] the order to do that and the one tells me---the friend that Tyree had that shoot me is named Tyree, too. That's what he told me.

(N.T., 6/24/15, pgs. 77-79).

This line of questioning by trial counsel is repetitive of both the Commonwealth's direct examination and [Appellant's co-defendant's] counsel's cross-examination as described heretofore.

- 20 -

In addition, Detective Keppel testified that Mr. Wilkinson contacted him several days after the shooting to advise that he had learned that the shooter's name was "Tyree." Later, when the detective presented Mr. Wilkinson with a photo array, he identified Appellant as the man who shot him. (N.T., 6/24/15, pgs. 156-61, 169). Detective Urban subsequently coordinated the lineup in which Mr. Wilkinson identified Appellant as the shooter, and he testified that Mr. Wilkinson made the identification of Appellant without hesitation. (*Id.*, pgs. 107-08). Again, at trial, Mr. Wilkinson identified Appellant as the shooter—again without hesitation. (*Id.*, pgs. 14, 25-28).

It is illogical to believe that Appellant's conviction hinged on Wilkinson's testimony that "somebody" told him Appellant's name….Trial counsel's follow-up questioning in this regard was merely repetitive of the information properly entered into evidence. There would have been no reason for counsel to request a limiting instruction from the court where the testimony elicited was admissible evidence.

Again, even if this testimony was improperly admitted, [Appellant has not demonstrated any] impact on the unequivocal identifications of Appellant as the shooter. Trial counsel's questions concerning the identity of this third party are similarly of little evidentiary value, and certainly caused no prejudice to Appellant. If anything, trial counsel succeeded in showing that [Wilkinson] either had a lapse in memory or was deliberately withholding the identity of this third party. Appellant cannot show that he suffered any prejudice by this line of questioning.

PCRA Court Opinion, filed 5/13/21, at 13-16.

We agree with the PCRA court's sound reasoning. Specifically, we agree there is no arguable merit to Appellant's underlying claim, and thus, his ineffectiveness claim fails on this basis. *Johnson*, *supra*. Further, we agree with the PCRA court that Appellant has failed to demonstrate that he was prejudiced by counsel's actions. *See Spotz*, *supra*. Accordingly, Appellant is not entitled to relief on his claim.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/19/2022